# JOHN B. CARROLL

## *v.*

## THE CITY OF EAST ST. LOUIS.

1. FOREIGN CORPORATION—*power to purchase and hold lands in this State.* A corporation, created in another State for the sole purpose of buying and selling lands, has no power to purchase and hold the title to lands in this State, as it is against the general policy of our legislation on the subject of domestic corporations, and would tend to create perpetuities.

2. SAME—*contracts enforced by comity only.* It is well established that a corporation created in one State can not exercise its functions in another State or sovereignty without permission of the latter, express or implied. The comity between States, so far as it relates to corporations, depends for its exercise upon the laws of the sovereignty in which the power is to be exercised. The comity thus extended is the voluntary act of the State or nation by which it is offered, and is inadmissible when contrary to its policy or prejudicial to its interests.

3. In the absence of any positive law denying or restraining the operation of a foreign law, courts of justice will presume the tacit adoption of them by their own government, unless they are repugnant to its policy or prejudicial to its interests. The public policy of a State must be determined by reference to its general legislation, either by prohibitory or enabling acts, or by its general course of legislation on the given subject.

4. STATE POLICY—*law making power must determine.* It is the legislative, and not the judicial power in the State, that must control and give shape to its public policy. Courts can only ascertain and observe that policy, and apply it to cases as they arise, without changing or obstructing it.

5. A corporation, created by the general assembly of the State of Connecticut, for the purpose of purchasing and selling lands to the extent of $500,000, there being nothing in its charter compelling the company to sell lands it might acquire, within any fixed period, expended its whole capital stock in the purchase of land in this State, and made a deed for the conveyance of a lot to the city of East St. Louis: *Held*, in an action of ejectment by the city to recover possession of the lot, that the foreign corporation took no title by its attempt to purchase, and were unable to transmit any to the city.

APPEAL from the Circuit Court of St. Clair county; the Hon. JOSEPH GILLESPIE, Judge, presiding.

Mr. CHARLES CONLON, and Messrs. JOHN M. & JOHN MAYO PALMER, for the appellant.

Mr. WM. H. UNDERWOOD, Mr. C. C. WHITTLESEY, and Messrs. GLOVER & SHEPLEY, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was an action of ejectment, brought by appellee, in the circuit court of St. Clair county, against appellant, to recover a number of lots in East St. Louis. A declaration in the usual form was filed, and defendant interposed the general issue. The case was submitted to the court for trial, without a jury, by consent of the parties, and the issue was found for plaintiff, and a judgment was rendered in its favor.

The parties stipulated, on the trial in the circuit court, that, in September, 1869, the fee of the premises in dispute was in Samuel S. M. Barlow and others, and that they conveyed the lands in dispute to the "Connecticut Land Company;" that it was a body corporate, created by the general assembly of the State of Connecticut, by act of the 27th of July, 1860. Their charter shows that Joseph Alsop, Wm. M. McFarland, Samuel S. M. Barlow and Wm. H. Aspinwall were created a corporation, with a capital stock of $200,000, with the privilege to increase it to half a million.

They are empowered by their charter to adopt by-laws, provided they do not conflict with their charter, or the laws of Connecticut. The body is empowered to receive, grant, convey, dispose of and transfer real estate, and to take the management and charge of the same, as well as such personal property as they may deem necessary to carry on their business transactions, and sell and exchange the same for other property as they may deem to the interest of the corporation. They are also authorized to make, execute and deliver all necessary instruments, either with or without the seal of the corporation.

The charter provides that the affairs of the company shall be managed by not less than seven directors, one of whom shall be president. The office of the company is, by the charter, located at Hartford, in that State.

It appears, from the stipulation, that the company purchased the property of Barlow and others, and took possession and held it until they conveyed to the city. It is also agreed that, after the sale was made to the city, defendant entered into possession of the lots and still holds them; that the company holds these and other lands in and near the city of East St. Louis, in the purchase of which their capital of $500,000 has been expended. And it was finally stipulated that the points to be decided were: "Had the Connecticut Land Company power under their charter to hold the lands in fee simple under the deed from Barlow and others? Had the company power to convey the title in fee to the city?"

Can a corporation, created in another State for the sole purpose of buying and selling lands, come here and prosecute the business for which it was created, by purchasing and holding lands in this State?

Owing to the interests involved in the case under consideration, and the results which may flow from the answer which may be given to this question, it is supposed to assume more than ordinary importance. Whether there are other sales similar to this, the record fails to disclose; and if there be any others, whether many or few, that fact could not change the law nor the decision of the case, and hence we shall disregard that portion of the argument which insists that other conveyances are endangered. We shall endeavor to decide the case on the record, as made and presented to the court.

All persons in the profession, we presume, will admit that a corporation, created in one State, can not exercise its functions in another State or a different sovereignty without permission. This is the doctrine announced in *The Bank of Augusta* v. *Earle*, 13 Peters, 589, *O. & M. R. R.* v. *Wheeler*, 1 Black, 297, *Ducat* v. *The City of Chicago*, 48 Ill. 172, and

*Paul* v. *Virginia*, 8 Wallace, 168.    And if the proposition were not so fully understood and so firmly established, numerous other cases might be cited as confirming the rule.

The all important question, then, in this case is, to determine whether consent can be inferred from the course of legislation as indicating the general policy of this State. If such consent exists, it can be gathered alone from implication, as there is no direct legislation on the subject.    In the case of *The Bank of Augusta* v. *Earle, supra*, it was said that the comity between States, so far as it relates to corporations, depends for its exercise upon the laws of the sovereignty in which the power is to be exercised, and a corporation can make no valid contract without their sanction, expressed or implied.    The comity thus extended to other nations is no impeachment of sovereignty.    It is the voluntary act of the nation by which it is offered, and is inadmissible when contrary to its policy or prejudicial to its interests.    It is also said in the same case that, in the absence of any positive law affirming, denying or restraining the operation of a foreign law, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy or prejudicial to its interests.    It must be conceded that each State has the power, uncontrolled by another, to establish rules regulating the tenure of the lands lying within its limits, and the manner of buying and selling property by persons under its jurisdiction.

If, then, as there is no direct legislation on the subject, this purchase by the Connecticut Land Company is repugnant to the policy of the State, or it is prejudicial to its interests, the sale we have seen would be void.    In this investigation, it must be remembered that the law-making power of the State where the authority is proposed to be exercised, is alone invested with the authority, and must determine its public policy.    With this power the courts have not been intrusted. It is for them to ascertain and apply the law and the legislative policy, and not to inaugurate it.    The public policy of

the State may be ascertained by reference to the general course of legislation, either by prohibitory or enabling acts, or by its general course of legislation on a given subject.

Our general assembly have, in a variety of modes, and on a very large number of occasions, manifested, in unmistakable terms, a determination that perpetuities in real estate shall not exist in this State. To prevent it, and to keep the tenures of the lands in the State free, at an early period in the legislation of the State, the common law allowing entails was abolished, and such conveyances rendered inoperative to create such an estate. And, inasmuch as such tenures create a perpetuity in particular families, it tends to give to them special privileges not enjoyed by all. It is the foundation upon which aristocracies are built and sustained. It takes real estate out of market and prevents its acquisition by the citizens generally, and prevents its distribution even in families by devise or descent. These, and it may be other considerations, have induced, it is believed, every State in the Union to abolish estates tail, because they, by creating perpetuities, are not in harmony with the principles upon which our government is based, and are prejudicial to the general welfare and prosperity of our people.

The policy of the legislation in this country, ever since the establishment of our form of government, has been with a view to leave all free to acquire property, and to protect and foster no class by conferring special privileges, or placing, or even permitting wealth to be placed, in the hands of a portion, to be held in perpetuity. In fact, its pernicious effects were so clearly seen and felt in Great Britain, that perpetuities have been discountenanced in their jurisprudence. The theory of our government is, that not only the laws must protect all alike, but that every citizen must be left equally free in the pursuit and acquisition of property. When feudalism prevailed throughout Europe, the care of the governments was for the lords and the privileged classes, and entails and perpetuities of tenures in their families, or particular portions

of them, was adopted as the best means to secure their continued wealth and influence. But as trade and commerce advanced, and the principles of free government became better understood, it was found that the public welfare was retarded by restrictions upon the tenures to their landed property, and for centuries the fetters that have trammeled it have been gradually and constantly relaxing and being removed, until many of the inconveniences attending the system have disappeared.

Of the same nature as the feudal system were monasteries and religious houses, that acquired large bodies of lands and held them in perpetuity. The prejudicial effects of this policy were, at an early day, felt, as it took real estate out of the commerce of the country, and was found to be a serious impediment to national prosperity if not to advancing civilization. This was, perhaps, the strongest motive that led to the enactment of the laws of mortmain in Great Britain. There were, no doubt, other considerations, such as, that it curtailed the power and influence of the feudal lords, and their loss of revenues, by being deprived of their escheats, wardships, reliefs and the like. Hence, these laws of mortmain were adopted, allowing the lord immediate to declare a forfeiture of the estate sold to a corporation, and on his failing to do so, then the lord mediate might, and on his failure to do so, then the king.

Thus it will be observed that these statutes do not prevent corporations from taking title by conveyance, but only enabled the forfeiture of the title, which thus passed to the lord or the king. If, then, these bodies are not prohibited from taking by the laws of mortmain, they, if in force in this State, would not prevent this corporation from holding lands until the State should proceed and obtain a forfeiture. Whether or not they are in force when applied to a proper case, we shall not now determine, as we think they have no application to this case.

Our general assembly have, from the very organization of our government, manifested a clear and decided opposition to permitting corporate bodies to hold lands to any great extent in perpetuity. In granting charters to insurance, agricultural, manufacturing and benevolent organizations, of which we have large numbers, as a general rule, with, it may be, a few exceptions, when authorized to buy and sell lands, they have been restricted to a small quantity. So jealous has been the legislature of the power to purchase and sell lands by these organizations, that it adopted, as a policy, that the authority thus given should not be perverted and abused ; that they, as an undoubted policy, limited the power to only enough of real estate to enable them to carry out and accomplish the purposes of their organization, other than buying and selling real estate.

In the advancement of education, the most cherished object of our people and their representatives, we would expect, if anywhere, to find the greatest and most liberal relaxation of this policy. If permitted to own and lease large farms, colleges, academies and seminaries could thus greatly increase their revenues and avoid the financial embarrassments that so generally overtake and destroy these popular institutions. But even the great object of education has not induced our general assembly to depart from its policy of preventing these bodies from holding lands in perpetuity. In the great number which have been incorporated by special charter, we have examined many, but have found none but are limited to comparatively a small quantity of land. The general assembly seem to have been determined, no matter how useful the ownership of land in perpetuity might be in supporting these institutions, or how much it might aid in accomplishing the object of their creation, they should not have that means. And where, in such charters, power has been given to receive donations of lands, they have, almost invariably, been required to sell it in three, five, seven or ten years, at most, thus unmistakably showing a settled policy

that no means should be possessed by corporations, whether as the primary or auxiliary purpose of their creation, to hold lands in perpetuity.  So with churches; all know that the burthens of supporting religion could be greatly diminished if they could hold large bodies of lands and houses, and derive large revenues from rents and profits.  But it is believed that our legislature has not, unless it be with rare exceptions, departed from its fixed policy, even with these bodies, where incorporated.

In fact, the whole course of our legislature, in the hundreds of charters granted, shows a fixed and stern determination not to yield such powers to these bodies.  At the session of 1843, the general assembly passed a general law authorizing the organization of incorporated seminaries and academies of learning.  Whilst this law granted large powers to such bodies, it expressly inhibits them from severally holding more than 160 acres of land.  This law was revised in 1849, when the power to hold lands was increased to 1000 acres. In 1835, (p. 188,) a general law was adopted, authorizing the incorporation of religious societies, and by it these bodies are limited to ten acres.  And the act of 1839 authorized any church to hold forty acres for camp-meeting grounds.  The general law, found in the Revised Statutes, p. 121, for the incorporation of libraries, limits their property, real and personal, to the annual value of $600, exclusive of their library and the annual payments made by the members.

In 1849, a general law was adopted, authorizing boards of trade to be incorporated, and limits their power to hold real estate to one city, town or village lot, and building, in the city, town or village where the body is located.

In 1852, a general law was passed authorizing the incorporation of hospitals for boatmen, and it limits the amount of land such an organization can hold to ten acres.

At the session of 1855, a law was adopted authorizing the incorporation of agricultural societies, and they are prohibited from holding more than $10,000 worth of property, of

every kind or description. At the same session, a law was adopted authorizing the formation of incorporated cemetery associations, and they are limited to fifty acres.

At the session of 1859, a law was passed authorizing the formation of benevolent societies as incorporated bodies, and by implication limits the power to hold real estate to the lot and house used by the company, and to donations, which, by the eighth section, is required to be sold within five years.

At the session of 1849, a law was adopted, enabling the formation of corporations for manufacturing, agricultural, mining and mechanical purposes, and it limits the amount of real estate which they may hold to what is necessary to carry out the general purposes of their organization.

Another law was adopted in 1859, for the organization of incorporations for benevolent, educational, library, musical, scientific and missionary purposes. The eighth section prohibits, by implication, the holding of real estate to the lot and building thereon used by the company, and requires donations of lands to be sold in five years.

In the act of 1857 (p. 161), the incorporation authorized for manufacturing, mining, mechanical and chemical purposes, is authorized to hold only so much real estate as may be necessary to carry out the purposes of their organization. Other general laws might be referred to, as well, it is believed, as hundreds of special acts which contain similar restrictions.

We are fully aware that the object of the creation of such bodies was not to buy and sell lands, but the legislature seem to have been vigilant in expressly preventing such bodies from using the power contained in most of their charters to purchase and convey such property, from being perverted to such a use. It is this extreme caution that manifests the policy of the law-making power of the State. We do not infer this policy, as seems to be supposed, because the legislature did not, in terms, confer the power on these various bodies, but it

is from the almost uniform prohibition of its exercise, and in this is the distinction.

We have been referred to some half a dozen private acts passed by our general assembly, creating corporations for various purposes, in which power is, incidentally in some, and as the primary object in others, given to buy and sell lands. They are special and private laws, and to our minds do not tend, in the slightest degree, to determine the general policy of the State on the subject. Like all other exceptions, they tend to establish, rather than impair, the force of the general rule. It is to the general laws of a State to which all persons refer to ascertain its general policy, but in this case our special legislation is overwhelmingly in support of the general laws on the subject. We are totally at a loss to conceive how we can infer that, because a few special charters are opposed to the fixed and almost uniform policy of the State, for a half of a century manifested on almost every occasion when a charter was asked, that the entire policy of the government has thus been changed. We regard it as forming none, not even the slightest ground, for such an inference. But since the charters referred to were adopted, as also that under consideration, the same policy has been clearly manifested.

At the session of 1871–2, the general assembly, in revising the general incorporation laws, have adhered strictly to the policy so clearly manifested by former legislation. The first section of that law provides for the formation of such bodies for any lawful purpose, except banking, insurance, real estate, brokerage, the operation of railroads and the business of loaning money. It is contended that this section, by implication, authorizes the formation of incorporations to buy and sell real estate, as it does not, in terms, prohibit it, and if so, the Connecticut Land Company may do so, as we should infer a change of policy. If this was the only provision in this enactment, it would be a violent presumption, in view of the past legislation, to arrive at such a conclusion. But the fifth section relieves it from all doubt, if there is any, as it limits

37—67TH ILL.

all but churches organized under the act, to so much real estate as may be necessary for the purposes of their organization. Churches are, as before, limited to ten acres ; but corporations are authorized to purchase lands in satisfaction of debts due them, but are required to offer the same for sale at public auction, as often, at least, as once in each year, and if not thus sold for cost and interest within five years, the State's Attorney is required to institute proceedings in the circuit court for the sale of such property.

We should not expect that foreign corporations, who can perform no binding act in our State without our consent, would demand more rights and privileges than are conferred on our own, created by general law. If the general assembly, for any reason, confers special powers upon a few corporations that have been persistently and almost uniformly denied to all other corporations of our State, it gives foreign bodies, who only act here by mere sufferance, no right to demand the same privileges. They should surely not complain if permitted to exercise their powers here to the extent, and only to the same extent, that similar bodies of our own are allowed under our general laws.

Again, we learn from the journals of the two houses of the general assembly, that a charter similar to this, and apparently for the same purpose, and to subserve the same interest, was asked at the session of 1867, but it failed to pass because of an adverse vote. The application was renewed at the session of 1869. The bill passed both branches of the general assembly, and was sent to the Governor for his approval, but he returned it with his objections, to the Senate, where it originated. In his message, the Governor placed his objections on the ground of public policy ; and that, even if that bill were harmless, still it would form a dangerous and unwise precedent. In these views, the Senate seem to have almost unanimously concurred, although the charter limited its existence to twenty-five years, as but three members voted

for its passage notwithstanding the Governor's objections, and all of the other members against its adoption.

In the light of all this legislation, it would require a great stretch for the courts to disregard the policy of the State which has obtained from the first. It is the legislative, and not the judicial power in the State, that must control and give shape to its public policy. That power does not pertain to the courts. They can only observe that policy and apply it to cases as they arise, without changing or obstructing it.

The charter of this company, by obscure language, gives power to purchase lands, and authorizes the body to sell and convey the same. There is nothing in it requiring them to sell a foot of such lands for centuries to come, and if efforts were made to compel them to sell, then the claim of vested rights would, no doubt, be interposed. Again, that body is beyond the reach of our laws to dissolve it if they abuse their franchises and forfeit their charter. Hence it would be, no doubt, highly prejudicial to our people to have lands held in their midst in perpetuity, and beyond the reach of our laws, let them abuse their powers as much as they might choose. Nor are we prepared to hold that a sister State may send here, purchase large bodies of our lands, and lease and control them and their title under the laws of that State. And if the State can not, it can not create an artificial body to come here and hold them under such regulations as their charters or amended charters may prescribe.

We have been referred to numerous and able opinions of courts of other States, for whom we have the highest respect, which announce a different rule from that we have adopted. In those opinions, we have no doubt they have fully and fairly carried out the legislative policy of their States. But we have as little doubt that their public policy differs from ours. What may be supposed to be highly calculated to advance the public interests of one State, may be regarded as pernicious in another; hence the great diversity in the

statutes of the various States, which are but a manifestation of the public policy of each State. And, in the light of the past and present legislation in this State, we do not entertain the slightest doubt that we have, in this case, adhered strictly to the fixed policy of our State, and if so, we are powerless to change that policy if we would. If, in our conclusions, we are mistaken, the legislature can, and no doubt will, promptly apply the corrective.

We will say that, since the petition for a rehearing was filed, we have gone over and carefully reviewed the entire grounds of our decision, and have found nothing to even create a doubt as to its correctness, but have availed ourselves of the opportunity of putting our views in somewhat a different form, which will be substituted for the opinion previously filed. We are, therefore, compelled, in view of the conclusion at which we have arrived, to hold, that it is manifestly against public policy, and would be prejudicial to our State, to permit the Connecticut Land Company to come here and purchase and hold lands, and sell, or hold them in perpetuity, as they might choose; and we, under the authority of *The Bank of Augusta* v. *Earle, supra,* must hold that, by the effort to purchase, this company took no title to these lands, and were unable to transmit any to the city. Hence, there was no right to recover, and the judgment must be reversed.

We do not desire that what we have said shall be applied to incorporations, whether domestic or foreign, which have purchased lands for the mere purpose of erecting offices or buildings necessary for the purpose of carrying out the legitimate business for which they were organized, and in purchasing lands in collecting debts. In such cases, where their charters have authorized it, we presume they might purchase and hold real estate to that, but no greater extent.

The judgment of the court below is reversed, and the cause remanded.

*Judgment reversed.*

Mr. JUSTICE SCOTT, and Mr. JUSTICE SHELDON : In so far as the above opinion would hold invalid a transfer of land by the corporation to a purchaser, we are not prepared to concur therein.