JOHN S. STEVENS

*v.*

CYRUS N. PRATT *et al.*

*Filed at Springfield Sept. 30, 1881—Rehearing denied January Term, 1882.*

1. CORPORATION—*right to take real estate security for debts.* The latter part of sec. 26, of the general Incorporation law of 1872, was not designed to prevent corporations from taking mortgages on real estate as security for debts. It would seem that the right to take such security, by the policy of our law, may be regarded as an incident to the right to create a debt.

2. SAME—*former decision as to corporations for loaning money.* That part of the opinion of the court in *United States Mortgage Co.* v. *Gross,* 93 Ill. 483, holding that it was a part of the policy of the law of this State, as shown by sec. 1 of the general Incorporation act of 1872, that corporations should not be formed in the State for the business of loaning money, is overruled.

3. This court also erred in that case in holding that the first sentence of sec. 26 of the general Incorporation law of 1872, manifests a policy that foreign corporations were to have no right to loan money in this State.

4. The clause in the Incorporation law of 1872, that "corporations may be formed in the manner provided by" that act, "for any lawful purpose, except banking, insurance, real estate brokerage, the operation of railroads, and the business of loaning money," was not intended to, and does not by implication, prohibit the formation of corporations for the purposes so excepted, under other acts. It only prohibits their formation under that act, and therefore does not show that such corporations are prohibited by the policy of the law.

5. SAME—*foreign corporations, powers, etc., no greater than those of domestic.* The general Incorporation law of 1872 neither grants nor prohibits the right of foreign corporations to do business in this State. It is simply a law imposing regulations and restrictions, and its meaning is, that where the general laws of this State provide for the organization of corporations, foreign ones of like character doing business in this State shall exercise no greater or different powers, and shall be subject to the same liabilities, restrictions and duties.

6. SAME—*foreign, when no provision is made for like domestic.* The failure to provide for the organization of other domestic corporations than those named in the general law on the subject, is not an exclusion of foreign corporations of like character. The excepted corporations, and foreign corporations of like character, are simply unaffected by the general law of 1872; and as the formation of such corporations in the State is not prohibited, there is no prohibition of foreign corporations of the same character from doing business in this State.

7. SAME—*policy of State—how made to appear.* The policy of a State not to permit the transaction of business in its limits by foreign corporations, or to allow such corporations to acquire and hold real estate, must be expressed in some affirmative way. It can not be affirmed from the fact that the legislature has made no provision for the formation of similar corporations.

8. SAME—*policy of State to give power to make loans, etc.* The policy of the legislature of this State for many years has been to invest corporations with the power to loan money, and take mortgage on real estate as security therefor.

9. A loan made by a foreign corporation, in 1873, to a citizen of this State, secured by a mortgage given at the time, is not void as being prohibited by any legislation of the State, or contrary to public policy, and such mortgage may be foreclosed, and pass the title to real estate.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This was an action of ejectment, by appellant against appellees, for certain real estate in the city of Chicago, tried in the Superior Court of Cook county. The plea was, not guilty.

Preliminary affidavit was filed showing that the parties claimed from a common source of title—one Richard B. Appleby. Appellees claimed under a mortgage executed by said Appleby to the United States Mortgage Company, to

secure a note, for money loaned, of $5000, on the 25th of April, 1873, and duly recorded in the proper office on the next day. Appellant claimed under a mortgage executed by said Appleby to Elizabeth D. Smith, on the 17th of September, 1873, and duly recorded in the proper office on the 23d of said month, to secure a loan of $2000.

Appellant claimed that he was entitled to hold title entirely disregarding the mortgage to the United States Mortgage Company, on the ground that the note and mortgage to that company were absolutely void.

The court rendered judgment on the trial in favor of appellees, and the record comes here by appeal.

Mr. W. C. GOUDY, and Mr. JAMES E. MONROE, for the appellant:

1. The United States Mortgage Company, at the time it made the loan to and received the pretended mortgage from Appleby, was expressly prohibited by the statutes of Illinois from exercising its powers in this State. General Incorp. Law of 1872, secs. 1 and 20; *United States Mortgage Co.* v. *Gross,* 93 Ill. 492.

2. A contract prohibited by statute, or against the manifest policy of the law, is a nullity. *Cincinnati Ins. Co.* v. *Rosenthal,* 55 Ill. 91; *Carroll* v. *East St. Louis,* 67 id. 577; *Starkweather* v. *American Bible Society,* 72 id. 50; *United States Trust Co.* v. *Lee,* 72 id. 143.

3. A mortgage made to a National bank to secure a contemporaneous loan is void. It passes no title and creates no lien, because the bank has not the power to take the mortgage, and the taking of it is prohibited. *Fridley* v. *Bowen,* 87 Ill. 155; *Fowler* v. *Scully,* 72 Pa. St. 456; *Crocker* v. *Whitney,* 71 N. Y. 161; *National Bank* v. *Powell,* 2 Dillon, 371; *Ripley* v. *Harris,* 3 Biss. 199.

4. All conveyances and contracts made in violation of law are void. Such conveyances pass no title. No one can

pass a title or right on the violation of law. *Mitchell* v. *Smith*, 1 Binn. 110; *New York Ins. Co.* v. *Ely*, 2 Cow. 678; *Fowler* v. *Scully*, 72 Pa. St. 468.

5.   When there is no right to acquire a title as mortgagee, the mortgage is a nullity.   *Fowler* v. *Scully*, 72 Pa. St. 468; *Metropolitan Bank* v. *Godfrey*, 23 Ill. 610.

6.   A deed which is insufficient to pass the title can not be made valid by subsequent legislation.   *Lane* v. *Soulard*, 15 Ill. 125; *Illinois R. R. Co.* v. *Cook*, 29 id. 241; *Rogers* v. *Higgins*, 48 id. 211; Same case, 57 id. 244; *Russell* v. *Ramsay*, 35 id. 262, 374; *Deininger* v. *McConnel*, 41 id. 227; *Conway* v. *Cable*, 37 id. 82; *Gebhart* v. *Reeves*, 75 id. 301; *Helm* v. *Webster*, 85 id. 116; *McDaniel* v. *Correll*, 19 id. 226.

7.   Courts will not so construe general words in a statute as to give them a retrospective operation to take away rights of property previously vested, unless the intent is very clear. *Gillmore* v. *Shuter*, 2 Md. 310; *Couch* v. *Jeffries*, 4 Burr. 2461; *Dash* v. *Van Kleek*, 7 Johns. 477; *Wood* v. *Oakley*, 11 Paige, 403; *Matter of Protestant Episcopal School*, 58 Barb. 161; *Williams* v. *Johnson*, 30 Md. 500; *Hooker* v. *Hooker*, 10 S. & M. 599.

8.   The following cases are believed to be in point on the exact question raised in this case,—that is, the question of the power of the legislature to validate the mortgage of the mortgage company, to the prejudice of Smith's mortgage interest. *Meighen* v. *Strong*, 6 Minn. 177; *Thompson* v. *Morgan*, id. 292; *Wright* v. *Hawkins*, 28 Texas, 452; *Sherwood* v. *Fleming*, 25 id. (Supp.) 408; *Williamson* v. *New Jersey R. R. Co.* 29 N. J. Eq. 311; *Smith* v. *Morse*, 2 Cal. 524; *Garnett* v. *Stockton*, 7 Humph. 84; *Bolton* v. *Johns*, 8 Barr, 145; *Ballard* v. *Ward*, 89 Pa. St. 358.

9.   The following cases are on the point that the law of the State, in force when the contract is made, is a part of the contract, and a statute changing the law to the prejudice of either party to the contract is violative of the obligation

of the contract, and void: *Bronson* v. *Kinzie,* 1 How. 311; *Brine* v. *Insurance Co.* 96 U. S. 627; *Edwards* v. *Kearzey,* 96 id. 601; *Van Hoffman* v. *Quincy,* 4 Wall. 535; *McCracken* v. *Hayward,* 2 How. 508; *Smoot* v. *Lafferty,* 2 Gilm. 383.

Messrs. Dexter, Herrick & Allen, Mr. M. W. Fuller, and Mr. Frank J. Crawford, for the appellees:

The loaning of money by corporations created for that business was not, at the time of this transaction, prohibited by any statute of the State of Illinois, expressly, or by just implication, and was not opposed to any general policy indicated in any particular statute of the State.

The policy of a State not to allow foreign corporations to transact business within its limits, or acquire and hold real estate, must be expressed in some affirmative way. *Cowell* v. *Springs Co.* 10 Otto, 59; *Christian Union* v. *Yount,* 11 id. 352.

A party having the benefit of the contract, it having been fully performed by the corporation, will be estopped from setting up a want of power in the corporation to make and perform the contract. *Whitney Arms Co.* v. *Barlow,* 63 N. Y. 63; *Darst* v. *Gale,* 83 Ill. 140; *Ward* v. *Johnson,* 95 id. 215; *Railway Co.* v. *McCarthy,* 96 U. S. 267; *Daniels* v. *Tearney,* 12 Otto, 421; *Ferguson* v. *Landrom,* 5 Bush, 230; *United States* v. *Hodsen,* 10 Wall. 395; *Mott* v. *United States Trust Co.* 19 Barb. 569; *Steam Navigation Co.* v. *Weed,* 17 id. 378; *Chester Glass Co.* v. *Dewey,* 16 Mass. 102.

An estoppel *in pais* may be shown as a defence in an action of ejectment. *Dickerson* v. *Colgrove,* 10 Otto, 579; *Kirk* v. *Hamilton,* 12 id. 68; *Lee* v. *Getty,* 26 Ill. 76; *Noble* v. *Chrisman,* 88 id. 187; *Fisher* v. *Milmine,* 94 id. 328; *Brown* v. *Wheeler,* 17 Conn. 352; *Shaw* v. *Bebee,* 35 Vt. 209; *Rangley* v. *Spring,* 28 Me. 127; *Burkholter* v. *Edwards,* 16 Ga. 597.

The legality of the corporation in making the loan can not be drawn in question in this suit. If a corporation can take land for some purposes, the question whether the particular

title was taken for an unauthorized purpose can not be tried collaterally. *Hough* v. *Cook County Land Co.* 73 Ill. 23; *National Bank* v. *Matthews*, 98 U. S. 628; *Union Water Co.* v. *Murphy's Flat Fluming Co.* 22 Cal. 621; *Grant* v. *Henry Clay Coal Co.* 80 Pa. St. 218.

When a corporation is incompetent by its charter to take a title to real estate, a conveyance to it is not void, but only voidable, and the sovereign alone can object. *National Bank* v. *Matthews*, 98 U. S. 628.

The legislature may, when it interferes with no vested rights, enact retrospective statutes to validate invalid contracts, or to ratify and confirm any act it might lawfully have authorized in the first instance. *United States Mortgage Co.* v. *Gross*, 95 Ill. 494; *Goshen* v. *Stonington*, 4 Conn. 210; *Beach* v. *Walker*, 6 id. 197; *State* v. *Newark*, 7 N. J. L. 197; *Foster* v. *Essex Bank*, 16 Mass. 245; *Cowan* v. *Mutual Benefit Life Ins. Co.* 52 Pa. St. 287; *Lane* v. *Nelson*, 79 id. 407; *Butler* v. *Toledo*, 5 Ohio St. 225; Cooley on Const. Lim. 374.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

In the view we take of the questions presented by this record, it will be sufficient to inquire whether the United States Mortgage Company's acts, in loaning its money to Appleby, and taking from him his note and mortgage therefor, were void. The contention of the counsel for appellant is, they were void, and therefore incapable of imparting rights to anybody, and if this be not correct, the judgment below must be affirmed, without regard to the merits of the other questions discussed. These acts involve no moral turpitude, and they are, in no sensible degree, detrimental to the public welfare, and the only ground upon which their invalidity is claimed is, that company, as a foreign corporation, created solely for the business of loaning money, can have no legal existence, and hence do no act forming the basis of a legal right, within this State.

In *United States Mortgage Co.* v. *Gross*, 93 Ill. 483, it was assumed, from the name of this corporation, the character of its transactions there involved, and the facts appearing in the case, that its principal or sole business was to loan money, taking to itself mortgages on real estate to secure the same, and it was thereupon there said: "The general Incorporation law of 1872, which was in force when the mortgage was executed, provided for the formation in the State of companies for any lawful purpose, expressly excepting, however, corporations for banking, insurance, real estate brokerage, operation of railroads, and the business of loaning money." Section 26 of the act provided that "foreign corporations, and the officers and agents thereof, doing business in this State, shall be subjected to all the liabilities, restrictions and duties that are, or may be, imposed upon corporations of like character organized under the general laws of this State, and shall have no other or greater powers. And no foreign or domestic corporation, established or maintained in any way for the pecuniary profits of its stockholders or members, shall purchase or hold real estate in this State, except as provided for in this act.

"From these statutory enactments we deduce these conclusions: the latter sentence of section 26 was aimed at the purchasing and holding of real estate by corporations, for the reason such acts would tend to create perpetuities, and by this and other provisions of the same act the evil feared was effectually guarded against. We think, however, it was not designed thereby to prevent corporations from taking mortgages on real estate as security for debts. In fact, the act contemplates corporations will acquire real estate in satisfaction of indebtedness due them, and makes such provision in the fifth section for the sale of real estate so taken, as secures the State against the evil had in legislative view, and which had been discussed by this court in *Carroll* v. *City of East St. Louis*, 67 Ill. 568. Indeed, it is difficult to see how mort-

gages, which are conveyances subject to conditions of defeasance, can be considered as tending to create perpetuities. Payments made of the debts thus secured defeat the titles of the mortgagees, and even if they take possession, the incomes gradually undermine and destroy their titles. If the premises are sold under powers, the mortgagees can not, themselves, become purchasers, and if the mortgages are foreclosed by suit, the decrees of the court thereafter become the bases of title.

"But we see, from the first sentence of this section 26, it was the policy of the State that foreign corporations should have no other or greater powers in the State than corporations of like character organized under the general laws of the State; and further see, from the first section of the act, it was a part of that same policy that corporations should not be formed in the State for the business of loaning money. It follows, that corporations organized in a foreign State for such business of loaning money, could not claim to pursue such business in this State. The comity between the States does not demand we should hold this mortgage company, incorporated under an act of the State of New York, could lawfully, within this State, exercise powers denied to corporations formed within our own borders. All the acts of this company here done in furtherance of such business of loaning money, were invalid, as being obnoxious to our policy and institutions." But it was also held that the act of April 9, 1875, validated contracts of loans previously made by the company, and made them enforceable the same as if they had not been prohibited when made.

Counsel for appellant assail the latter, and counsel for appellees the former, position, as being unsound in law, and wholly incapable of being sustained upon any correct legal principles.

The question of the validity of such contracts may be far-reaching in its consequences, and affect large property rights.

If they are valid upon any ground, the decision should be placed on that ground, while if they are invalid they should be so declared, and the question put at rest, so that in the future they may be avoided. In *Bowers* v. *Green*, 1 Scam. 42, it was said by this court: "The maxim *stare decisis* is one of great importance in the administration of justice, and ought not to be departed from for slight or trivial causes; yet this rule has never been carried so far as to preclude courts from investigating former decisions, when the question has not undergone repeated examination, and become well settled." To the same effect is *Mallett* v. *Butcher*, 41 Ill. 383; *Leavitt* v. *Blatchford*, 17 N. Y. 533; *Pratt* v. *Brown*, 3 Wis. 609.

No reason exists, therefore, which should preclude our reëxamining the grounds of our decision in *United States Mortgage Co.* v. *Gross*, *supra*, so far, at least, as may be necessary to what we shall deem a correct decision in the present case; but, on the contrary, in view of the importance of the questions involved, it is a duty we owe to the court and to the public to do so, with such care as we can exercise. We still think, as there said, it was not designed by section 26 of the Incorporation law of 1872, to prevent corporations from taking mortgages on real estate as security for debts. Indeed, sections 5 and 17, in express language, contemplate that this shall be done, and provide regulations whereby, when title shall be acquired to real estate, the corporation shall be compelled to sell it, and thereby avoid the evils anticipated from the accumulation of titles to real estate in the hands of corporations, in *Carroll* v. *East St. Louis*, 67 Ill. 568. Moreover, the policy of taking mortgages upon real estate to secure the payment of debts, by corporations as well as by individuals, in almost innumerable instances, has been recognized by legislation in this State; and we are unable to recall an instance where a corporation has been allowed to create a debt, and has been, at the same time, denied the right to take mortgage on real estate to secure it. It would seem, the

right to take such security, by the policy of our`law, might
be regarded as an incident to the right to create a debt.
Under restrictions and regulations of like character with
those of the general law, no injurious consequences can
possibly result to the public from so holding.

Subsequent examination and reflection, however, have con-
vinced us that we were clearly in error in holding that it is
shown by the first section of this law that it was a part of
the policy of the State that corporations should not be formed
in the State for the business of loaning money. That section
simply defines the classes or kinds of corporations for the
organization of which the act is intended to provide. It says:
"Corporations may be formed, *in the manner provided by this
act,* for any lawful purpose, except banking, insurance, real
estate brokerage, the operation of railroads, and the business
of loaning money." It is not said, nor is it the reasonable
implication, that the corporations excepted may not be formed
*under other acts.* Indeed, the implication is directly the re-
verse, for the business of the excepted corporations, by the
proper construction of the language employed, is called "law-
ful," and there can, in the absence of unmistakable language,
be no presumption of exclusion of that which is "lawful,"—
that is to say, which has the sanction or permission, and is
consequently entitled to the protection, of the law. It is
well answered by counsel for appellees: "If this reasoning
is correct, it would follow that the first section was also a
declaration of the policy of the State that corporations should
not be formed for any of the other excepted purposes, includ-
ing insurance and the operation of railroads." Yet there
was, at that time, in force, and unaffected by that statute, a
general law providing for the formation of insurance com-
panies, and at the same session of the legislature at which
that law was enacted, another law was also enacted for the
formation of corporations for the operation of railroads. It
is true *that act* provides for only certain corporations, and

gives no right to incorporate for other purposes, and from this there may be an implication that the legislature would not grant the right to be incorporated for the excepted purposes, *in the same manner,* and subject to the *same regulations and restrictions,* but it is not therefore to be assumed that the legislature was unwilling to grant the right to be incorporated for the excepted purposes in *another manner, and subject to other regulations and restrictions.* From the different natures and purposes of the excepted corporations, reason exists why different and more stringent restrictions should be thrown around them; but in such a country as ours, the public welfare demands that they be allowed to be created, under proper and wise safeguards for the protection of the public, and not that they be absolutely prohibited.

On further consideration and reflection, we are convinced we also erred in holding that the first sentence of section 26 of that law manifests a policy that foreign corporations were to have no right to loan money in this State. That sentence does not say that no foreign corporation except those of like character as are provided to be formed under that act, shall be allowed to do business in this State. It does not assume to define what foreign corporations shall be allowed to do business in this State, but simply to impose regulations and restrictions upon certain named classes or kinds of foreign corporations doing business in this State,—that is, those of like character as it is provided may be formed under that general law. Its exact words are, "foreign corporations, and the officers and agents thereof, doing business in this State," (that is, that *are doing* business, not that shall hereafter *be allowed* to do business in this State,) "shall be subject to all the liabilities, restrictions and duties that are or may be imposed upon corporations of like character organized under the general laws of this State, and have no other or greater powers." The language is entirely that of regulation and restriction, and not that of grant or prohibition. No corpora-

tion is granted the right to do business in the State. No corporation is excluded from doing business in this State. Simply "foreign corporations, and the officers and agents thereof, doing business in this State," are placed on an equality, to the extent that they shall exercise no greater or different powers, and shall be subject to the same regulations and restrictions, and governed by the same rules of law in these respects, with corporations of like character organized or to be organized under the general laws of this State. The meaning will, obviously, not be changed, but may be placed in a stronger light, by a little transposition of language, thus : "Where the general laws of this State provide for the organization of corporations, foreign corporations of like character doing business in this State shall exercise no greater or different powers, and shall be subject to the same liabilities, restrictions and duties." The manifest and only purpose was to produce uniformity in the powers, liabilities, duties and restrictions of foreign and domestic corporations of like character, and bring them all under the influence of the same law. It can not be said that the failure to provide for the organization of other corporations, by general laws, is an exclusion of foreign corporations of like character, unless it shall be held that the failure to enact such general laws is an evidence that they are opposed to our policy.

But we have already said that from this failure there may be an implication that the legislature would not grant the right to be incorporated for the excepted purposes, *in the same manner and subject to the same restrictions;* but it is not therefore to be assumed that the legislature was unwilling to grant the right to be incorporated for the excepted purposes in *another manner, and subject to other regulations and restrictions.* The excepted purposes, banking, insurance, real estate brokerage, the operation of railroads, and the business of loaning money, we have also heretofore said are recognized by the general law as being "lawful." We know, from their char-

acter, they are not *malum in se,* and we know they have never become *malum prohibitum,* unqualifiedly, by any constitution or statute of this State, and our observation and experience teach us that under wise and wholesome restrictions and regulations they are important and beneficial, if not indispensable, factors in the general business welfare of the State. Whether they shall be allowed to be carried on by one individual or by many, by partnerships or corporations, is evidently purely a question of policy, and not a question of power or right in the government; and it may be asserted, without the fear of contradiction, that the policy of the State has been to allow banking, insurance, real estate brokerage, the operation of railroads, and the business of loaning money, either independently or in connection with or as incidental to other branches of business, by corporations—and this will hereafter be fully shown by reference to specific acts of the legislature. But corporations for these purposes, under our constitution, are private. The public does not become a stockholder in or owner of them, and so it is not the business of the legislature, of its own volition and unsolicited, in order to indicate its policy, merely, to incorporate or provide for the incorporation of such companies. The power to provide for the corporation exists, but it is useless to exercise it unless there is a demand for it,—in other words, if no persons desire to become incorporated for these purposes, no unfavorable inference can be drawn from the failure of the legislature to enact laws upon the subject. It is true, the reason a legislature fails to enact a general law providing for a particular class of incorporations *may be* because to do so would be opposed to its policy; but it may also fail to do so because there is no demand for such a law—either because the demand has heretofore been answered by special acts of incorporation, adopted prior to but continued in force by the present constitution, or because money in the State is scarce, and can be borrowed abroad, as is often the case, much cheaper than

at home, or from both causes. It can hardly admit of de-
bate, that, ordinarily, a demand for private charters, either
through general or local and special laws, will not exist unless
it is understood profitable returns can be made on money
invested in business thereunder; and whether such returns
can be made, will, usually, depend on questions entirely dis-
connected from the disposition of the legislature to grant or
withhold legislation for such charters. And so, it follows,
mere absence of legislation authorizing the formation, in the
future, of a particular class or kind of corporations, can not be
accepted as conclusive evidence that it is against public policy
to create such corporations.

But again, what was in the legislative mind when this
general law was enacted? Manifestly, only the classes of
corporations anticipated to be created under its provisions,
as defined in section 1. The necessity for, and the powers,
limitations and restrictions proper to other corporations
(those excepted), can, under no rational rule of construction,
be presumed to have been in mind. Stated differently, the
legislators' minds are presumed to have been directed to what
they were doing, and not to what they were not doing. They
were providing for certain corporations, leaving others unpro-
vided for, and so what they did not provide for is not affected
by the legislation they enacted, whether we regard domestic
or foreign corporations. The excepted corporations, and for-
eign corporations of like character, are simply unaffected by
this law. And this was the purport of our ruling in *Wincock
et al.* v. *Turpin*, 96 Ill. 135, where we held that the remedies
provided for creditors against stockholders, although in broad
and comprehensive language, applied only to the corporations
organized under this act.

We concede all foreign corporations might have been pro-
hibited from doing business in this State except those of like
character as contemplated to be organized under the provi-
sions of this act; but then it would have been very easy to

have said so in unmistakable terms, and we do not feel warranted in assuming, from the absence of language, or from, even (if it were to be found) ambiguous language, that a policy has been adopted so repugnant to the business welfare of our citizens, and so wanting in that spirit of comity which should characterize the conduct of the sister States towards each other.

Counsel say, "the prohibition is not against doing business in this State, but it is against having any other or greater powers, and as a domestic corporation could not have any, so the foreign could have none whatever." This would be true if the statute prohibited other corporations than such as are of like character with those contemplated to be incorporated under its provisions, from doing business in the State. But we have seen that this is not its language, nor, in our opinion, its meaning. It does not apply, either in terms or by implication, to other foreign corporations than such as are of like character with those contemplated to be organized under its provisions. What powers they may exercise, and what regulations or restrictions they shall be subject to, is defined. What powers other foreign corporations may exercise, and under what regulations and restrictions they shall be allowed to act, is not defined.

Counsel ask the question, "Can it be seriously pretended that a foreign corporation excluded from the State can make a contract in this State without authority, and enforce it in the courts of this State?" We answer, certainly not. But this assumes this corporation has been excluded from this State. How has it been excluded? We have shown it is not excluded by the positive *letter* of the law, and we think we have furnished satisfactory reasons why it can not be held to have been excluded by a fair construction of the *meaning* of the law. It remains only, then, to inquire whether, aside from the general law, it is contrary to public policy, or injurious to our welfare, to tolerate this corporation, and enforce its con-

tracts in this State. The only cases referred to by counsel, on this question, are *United States Trust Co.* v. *Lee,* 73 Ill. 142; *Cin. M. H. A. Co.* v. *Rosenthal,* 55 id. 85; *Starkweather* v. *American Bible Society,* 72 id. 50; *Carroll* v. *City of East St. Louis,* 67 id. 570.

In *Cin. M. H. A. Co.* v. *Rosenthal,* assumpsit was brought on a promissory note given for stock in an insurance company, and for premium on a policy issued by such company, payable upon the call of the directors. The defence interposed was, the insurance company was a foreign corporation, and it had not at any time, previous to the making of the note, furnished the Auditor of this State with a statement of the condition and affairs of the company, as required by the law then in force, and the Auditor had not issued to the company, or any agent, any authority to transact business in this State, which, it was averred, rendered the note void, and of no binding effect. The defence was sustained, and the note held void, upon the ground that the transaction was expressly prohibited by law. Among other things, the court there said: "The note was made and delivered, and the policy given, and the contract consummated, in this State, in defiance of a law which is so plain in its terms that it can bear no construction, and which no one can misunderstand, declaring all such contracts unlawful. It says, it shall not be lawful for any such agent, directly or indirectly, to take risks, or transact any business of insurance in this State, until they comply with the terms prescribed in the act. To permit the company, when they admit they have disregarded all these requirements, to recover, would be for the courts to disregard the clearly expressed will of the General Assembly, and to say what it has said shall be unlawful, is and shall be lawful and binding."

In *Carroll* v. *The City of East St. Louis,* the action was ejectment, and the question was, whether the Connecticut Land Company could, in this State, take, hold and convey

titles to real estate. It was held that it could not, because to allow it to do so would tend to create perpetuities, and it was contrary to the general public policy of this State to allow corporations to be created for the sole purpose of buying, holding and selling, or conveying real estate, and this was shown by reference to the practice of the State in refusing to grant charters, etc., for this purpose, and in the general legislation on kindred questions.

So far as *Starkweather* v. *American Bible Society* has any bearing upon this question, it rests upon the same principle as *Carroll* v. *City of East St. Louis.*

In *United States Trust Co.* v. *Lee*, it was held, upon the principle of *Carroll* v. *East St. Louis*, a foreign corporation can not be a trustee of real estate.

In neither of these cases was the mere absence of legislation creating or authorizing the creation of a corporation for a particular purpose, held to be sufficient evidence showing that it was against public policy to allow foreign corporations of like character to transact business in this State; but, upon the contrary, the decisions are expressly predicated upon the direct affirmative acts of the State in refusing to create such corporations, or in denying their power to transact business in the State.

In *Bank of Augusta* v. *Earle*, 13 Pet. 277, in answer to the position of counsel that the rules of comity between foreign nations do not apply to the States of this Union, that they extend to one another no other rights than those which are given by the constitution of the United States, and that the courts of the general government are not at liberty to presume, in the absence of all legislation on the subject, that a State has adopted the comity of nations towards the other States as a part of its jurisprudence, or that it acknowledges any rights but those which are secured by the constitution of the United States, the court, per TANEY, Ch. J. said: "The court think otherwise. The intimate union of these States

as members of the same great political family, the deep and vital interests which bind them so closely together, should lead us, in the absence of proof to the contrary, to presume a greater degree of comity, and friendship, and kindness towards one another than we should be authorized to presume between foreign nations. And when (as without doubt must occasionally happen) the interest or policy of any State requires it to restrict the rule, it has but to declare its will, and the legal presumption is at once at an end. But until this is done, upon what grounds could this court refuse to administer the law of international comity between the States? They are sovereign States, and the history of the past, and the events which are daily occurring, furnish the strongest evidence that they have adopted towards each other the laws of comity in their fullest extent. Money is frequently loaned in one State by a corporation created in another. The numerous banks established by different States are in the constant habit of contracting and dealing with one another. Agencies for corporations engaged in the business of insurance and of banking have been established in other States, and suffered to make contracts without any objection on the part of the State authorities. These usages of commerce and trade have been so general and public, and have been practiced for so long a period of time, and so generally acquiesced in by the States, that the court can not overlook them when a question like the one before us is under consideration. The silence of the State authorities while these events are passing before them, show their assent to the ordinary laws of comity which permit a corporation to make contracts in another State." And again, he says: "So far as any of them (the States) have acted on this subject, it is evident that they have regarded the comity of contracts, as well as the comity of suit, to be a part of the law of the State, unless restricted by statute."

The doctrine of this case is approved, and its ruling followed, in *Bank of Washtenaw* v. *Montgomery*, 2 Scam. 422.

The court there, among other things, said: "It can not well be imagined that the courts of any State would refuse to execute a contract by which a corporation had borrowed money in another State than that by which it was created. * * * Unless there should be a prohibition by statute, we can see no possible ground on which to rest the objection to the right of a foreign corporation to maintain an action in our courts."

In *Farmers' Loan and Trust Co. of N. Y.* v. *McKinney,* 6 McLean, 7, the court said: "In Michigan, no law or policy of the State is shown which prohibits corporations from purchasing lands in the State, and it is presumed that no such law as in the State of Pennsylvania exists in Michigan. It would seem, therefore, that the corporation of another State, as the Farmers' Loan and Trust Company, which is authorized by its charter to loan money on mortgages, may take a mortgage on lands in Michigan, there being no prohibitory law or policy of that State on the subject." Again it is said: "And that such a legal organization, having the right to loan money on mortgages without restriction of territory, should have a right to take mortgages wherever its loans are made, would seem to be a matter of course. And this may be safely assumed, where there is no prohibition."

In *Cowell* v. *Springs Co.* 100 U. S. (10 Otto,) 55, the National Land Improvement Company, of El Paso county, Colorado, was a corporation created under the laws of Pennsylvania, with power to "receive, hold, and grant real and personal property, explore, locate and improve lands, etc., * * provided such lands be located in Utah, Arizona, or adjoining States and Territories lying west of the Mississippi." By the law of Congress of March 2, 1867, then in force, the legislatures of the several Territories of the country were prohibited from granting private charters, and were only authorized to create by general law corporations for mining, manufacturing, and other industrial pursuits. The defendant contended

that this corporation had no capacity to act in the Territory of Colorado, and to hold and convey real property there,—that Congress intended to prevent the creation of corporations like this, and if a domestic corporation could not be created with such powers for reasons of public policy, a foreign corporation could not, for like reasons, be permitted to exercise them in the Territory. But the court said: "The answer to this position is found in the general comity, which, in the absence of positive direction to the contrary, obtains through the States and Territories of the United States, by which corporations created in one State or Territory are permitted to carry on any lawful business in another State and Territory, and to acquire, hold and transfer property there equally as individuals. If the policy of the State or Territory does not permit the business of the foreign corporation in its limits, or allow the corporation to acquire or hold real property, it must be expressed in some affirmative way,—it can not be affirmed from the fact that its legislature has made no provision for the formation of similar corporations, or allows corporations to be formed only by general law. Telegraph companies did business in several States before their legislatures had created or authorized the creation of similar corporations, and numerous corporations existing by special charter in one State, are now engaged, without question, in business in States where the creation of corporations by special enactment is forbidden." The same doctrine was subsequently repeated by the same court in *Christian Union* v. *Yount,* 101 U. S. (11 Otto,) 356.

No one pretends that the business of loaning money, or taking mortgage security therefor, was ever prohibited by law in this State, and we shall show the policy of this State has been to invest corporations with these powers.

On the 19th of February, 1857, an act was passed by the General Assembly, and approved by the Governor, incorporating the Farmers' Savings, Loan and Trust Company, and

15—101 ILL.

it was authorized to "have, enjoy and exercise all the powers necessary to carry out and execute the purposes. and intent of a savings, loan and trust company," and it was specially empowered to "take and hold any real estate, in trust or otherwise, as security for, or in payment of, loans and debts due or to become due, to purchase real estate at any sale made in virtue of any loan, debt or mortgage made to or held by the said company." (Private Laws of 1857, p. 1386.) The Chicago Loan and Trust Company was incorporated under an act of the legislature approved February 19, 1859, and it was empowered to borrow money, and receive money on deposit, and pay interest thereon, and to loan the said money," etc., and also to "take and hold any real estate, in trust or otherwise, as security for, or in payment of, loans and debts due and to become due to said company, to purchase real estate at any sale made in virtue or on account of any loan, debt, or mortgage, or trust, made to or held by the said company," etc. (Private Laws of 1859, p. 401, secs. 3, 4.) The Central City Trust Company was incorporated under an act of the legislature February 21, 1861. (Private Laws of 1861, p. 453.) The Princeton Loan and Trust Company was incorporated under an act approved February 16, 1865. (Private Laws of 1865, vol. 1, p. 24.) The Marion County Trust and Loan Company was incorporated under an act approved March 8, 1867. (Private Laws of 1867, vol. 2, p. 277.) The Avon Exchange and Loan Company was incorporated under an act approved March 31, 1869. (Private Laws of 1869, vol. 2, p. 700.) And the Montgomery County Loan and Trust Company was incorporated under an act also approved March 31, 1869. (Laws of 1869, vol. 2, p. 714.) And all of these last named corporations were vested with substantially the same powers, in respect to loaning money and taking mortgage therefor, as was the Chicago Loan and Trust Company, *supra*. In 1867, the General Assembly also incorporated the "International Mutual Trust Company," and

invested it with power to hold and loan money, and to take and hold real estate in trust, as security for the payment of loans and debts due the corporation. (Private Laws of 1867, vol. 1, p. 95.). And it was shown, upon the trial of *The People ex rel.* v. *Lœwenthal*, 93 Ill. 191, which was a proceeding by *quo warranto* to test the validity of that charter, that about 175 charters or statutes had been passed since the adoption of the constitution of 1848, establishing corporations with like powers as those conferred upon the International Mutual Trust Company. Many of these corporations, thus created by special charter before the adoption of the present constitution, are still doing business in the State, and have been ever since they were created, that instrument only providing for the formation of private corporations, under general laws, in the future, but leaving those organized and doing business before its adoption in full force, and unaffected by its requirements.

Since the adoption of the present constitution, and on the 4th of April, 1872, a general law was enacted to enable associations to become incorporated to raise funds to be loaned only among their members, and power was given to loan their capital, under certain restrictions, to their own members, and to take mortgage on real estate as security therefor, (2 Gross' Stat. p. 67,) and on the 9th of April, 1875, an act was approved "to enable corporations in other States and countries to loan money in Illinois, to enforce their securities, and acquire title to real estate as security." (Pub. Laws of 1875, p. 65.)

We doubt if a more uniform and consistent policy can be shown to have been pursued by the State upon any other subject, for the last twenty years, than is thus shown to have been pursued with regard to investing corporations with power to loan money and take mortgage upon real estate as security therefor.

But it seems to be thought that the corporations referred to materially differ from the corporation here, in that

they all had power to borrow money and receive money on deposit, etc., as well as to loan money, while here, the power is simply to loan money. If it be conceded that difference exists, can it affect materially the question under consideration? If a corporation be empowered to loan money and take mortgage therefor, is not this sufficient? In these special charters the power to loan is a separate and distinct power, and not incidental, merely. It is not compulsory on the corporations that they shall exercise all their granted powers, and inasmuch as the exercise of one power is not dependent upon the others, it is, it would seem, totally unimportant, on principle, whether one corporation be created with power to loan its capital, and another corporation be created with power to discount bills or notes, or one corporation be authorized to do all. If all are legal, when vested in one, what makes them illegal when vested in two? Can it possibly make any difference to the sovereign State of Illinois, or to any of its citizens, whether a foreign corporation, which comes here to loan its money, has power by its charter to effect insurance, as well as to loan money, or whether it has power merely to loan money? Is there anything in the exercise of this power by a corporation which is affected by the additional powers possessed by the corporation, or by the fact whether or not it has additional powers? Until it can be demonstrated that the possession of the additional powers can, in some substantial way, affect the loan, we must hold that it can make no difference whether the corporation be authorized to bank, or effect insurance, or build railroads, as well as to loan money, or whether it is authorized to effect loans, solely. We think it is only material to know, for the present purpose, that loaning money and taking mortgage on real estate as security are recognized, under our law, as a lawful business, and that it is a business which it has been the policy of our State to vest in corporations, and this, too, usually, without regard to whether other independent powers

in regard to business have also been vested in the corporations.

But this corporation, in addition to the power to loan money, is expressly invested with power, by its charter, to issue bonds of the company, and sell and dispose of them, (which is, in effect, power to borrow money,) to receive moneys on deposit, and to purchase, hold and convey such real estate, etc., as the company may acquire in the collection or settlement of its demands, etc., thus making it, substantially, a corporation of the same character as those incorporated under the special charters to which we have referred.

In the first section of the act of April 9, 1875, *supra,* it is enacted that any foreign corporation that may have invested or lent money in this State, "may have the same rights and powers for the recovery thereof, subject to the same penalties for usury, as private persons, citizens of this State," etc. Waiving all question of the competency and effect of this as a validating statute, we think, in connection with the practice of the State, as evinced in the enactment of the laws before referred to, that it should be regarded as conclusive on the question of the general public policy of the State. It emanates from the legislature,—the tribunal in which is lodged the power to determine the question of public policy,— and is an assertion, in effect, that the transactions of such corporations have not been contrary to the general public policy of the State.

In *Railway Investments and Securities,* 2 Redfield's Am. Ry. Cases, 226, in speaking of an analogous statute, Judge CURTIS, of the Supreme Court of the United States, then presiding at circuit, said: "After the legislature had thus granted to the corporation new powers, to enable it the better to accomplish its duties to the public by paying off this mortgage, and had interposed to facilitate the exercise of the powers of the trustees under the mortgage by regulating and

restricting the personal liabilities to be incurred by them in the exercise of these powers, it seems to be impossible to maintain that the mortgage itself is void because contrary to the public policy of the State. The will of the legislature, while acting within the powers conferred by the people of the State, constitutes the public policy of the State, and so far from manifesting its will to have this mortgage void and inoperative, it has interfered to help out its operation, and make it more easily available as a security. I do not think a court of justice can undertake to declare that mortgage was contrary to the public policy of the State, after the legislature has directly interposed to aid the mortgagees to act under it."

For the reasons expressed, we are of opinion the note and mortgage were not void when given, but were valid and binding, and being so, the junior mortgage by Appleby to Smith is not entitled to priority.

The decree of the Superior Court is affirmed.

*Decree affirmed.*

Mr. JUSTICE WALKER: I am unable to concur in the conclusion reached.

Subsequently, on an application for a rehearing, the following additional opinion was filed:

Per CURIAM: A rehearing is prayed for in this case, mainly on the ground that the appellant and his grantor purchased and paid for the land in controversy after the decision in *United States Mortgage Co.* v. *Gross*, 93 Ill. 483, and upon the faith of that decision. Counsel say: "After the last opinion in the *Gross case* had been filed, and after the decision therein had become, so far as this court could make it, the established law of this State, the appellant and his grantor (Corbine) purchased and paid for the land in controversy here, relying upon that decision; and believing, as they had a right to be-

lieve, that the law was as this court had therein deliberately declared it to be." But the decision in *United States Mortgage Co.* v. *Gross* was precisely as is the decision here, namely, that the mortgage to the United States Mortgage Company was valid, and hence entitled to priority over subsequent claims to the same property. In that case the court, in assigning reasons for the decision made, expressed the opinion that the mortgage, when first executed, was void, because contrary to public policy, but that it had been validated, and made binding and obligatory, by the act of April 9, 1875. This, however, was mere argument to justify the decision. The decision was, simply, as before said, that the mortgage was valid, and hence entitled to priority over subsequent claims to the same property.

On the theory of reasoning adopted by the counsel for appellant, when the appellant and his grantor bought, they bought with the knowledge and on the faith that this court held the mortgage by Appleby to the United States Mortgage Company valid and binding, and entitled to priority over the claim they were then purchasing. They have not been disappointed, therefore, by the present decision, and cut out of any right which, by *United States Mortgage Co.* v. *Gross*, we held they might acquire. The title or claim we held good in *United States Mortgage Co.* v. *Gross*, we still hold good, though for a different, and, we think, more satisfactory reason. Indeed, we have not here ruled that it is impossible to sustain the claim of the Mortgage Company on the ground assigned in the *Gross case*. We have simply placed our ruling on different, and, as we think, stronger ground. Had we, in all respects, not only ruled, but also reasoned, as in the *Gross case*, appellant's position would not have been, in the slightest, different from that which is now assigned to him.

It is nowhere decided that parties have vested rights in the reasons assigned for decisions. Where was it ever held

that a line of decisions was to be set aside, and the judgments opened up, merely because it was subsequently discovered stronger and more satisfactory reasons existed for the ruling than those expressed when the decisions were made? Had the decision here been different from what it was in the *Gross case,* the authorities cited by counsel would be applicable; but since the decision here is the same, and the reasoning in support of the decision only is different, they have no application.

It is also said by counsel, "instances mentioned of domestic corporations having power to loan money, are not applicable. All such corporations were banks." In this view, also, counsel are in error. We have expressly decided, in *People ex rel.* v. *Lœwenthal et al. supra,* such corporations are not banks.

In connection with this petition we have also carefully considered the petition for rehearing in *Commercial Union Assurance Co.* v. *Scammon,* 102 Ill. 46. The most forcible argument there, as we think, against our position as expressed in the opinion here, is thus stated: "When the State, by a constitutional requirement, prohibited its own citizens from acquiring any more special privileges of any kind, and passed laws for the formation of corporations for the transaction of almost every other kind of business but that of loaning money, it thereby declared that it would not, until it saw fit, permit the transaction of that kind of business through the instrumentality of any new corporation." This, as we conceive, is sufficiently answered in the opinion by the quotation there given from the opinion of Mr. Justice FIELD, in *Cowell* v. *Springs Co.* 100 U. S. (10 Otto,) 55. The act of Congress there imposed the same restriction upon the territorial legislature that our constitution imposes upon our legislature, and as has been seen, it was there held, and the court in express terms declared, "it can not be affirmed, from the fact that its legislature has made no provision for the formation of similar

corporations, or allows corporations only to be formed by general law," that the policy of the territory was against the formation of such corporations, but that such policy must be expressed in some affirmative way.

We have patiently, and with such care as we can bestow consistently with other duties, gone over and reconsidered every portion of the opinion, and we perceive no reason to take back or modify anything therein said.

The prayer of the petition is denied.

*Rehearing denied.*