POLLOCK v. THE CAROLINA INTERSTATE B. & L. ASS'N.

1. BUILDING AND LOAN ASSOCIATION.—A loan made by a building and loan association to one of its members is a *loan* and not a *partnership* transaction, and all monies paid on stock whether before or after loan must be credited on debt.

2. CONTRACT—PLACE OF PERFORMANCE.—This contract was to be performed in North Carolina.

3. EQUITY CASES—FINDINGS OF FACT.—Will this Court hear equity cases *de novo?*

4. FINDINGS OF FACT by Circuit Judge affirmed.

5. BANKS—CONSIDERATION — CONTRACT — POWERS.— The receipt of money by the cashier of a bank on deposit to be held subject to instructions, is a sufficient consideration to hold the bank to the performance of the conditions, and the cashier could so receive it.

Before KLUGH, J., September, 1897. Affirmed.

Action by W. P. Pollock and N. S. Pegues, assignees, against the Carolina Interstate Building and Loan Association and the Bank of Cheraw. Judgment for plaintiff. Defendants appeal.

*Messrs. R. T. Caston* and *W. F. Stevenson,* for appellant, cite: *Contract should be construed as stood:* 48 S. C.; 77. *When stockholder becomes borrower, his obligation as stockholder is not altered:* 49 S. C., 402; 34 L. R. A., 204; 29 L. R. A., 133; 27 S. E. R., 119; 25 S. E. R., 283; 48 S. C., 303; 51 S. C., 37. *Contract should be enforced according to terms:*

22 S. C., 411; 19 S. C., 450, 129. *Cashier could not make agreement:* 3 Rich., 46; 12 Rich., 461; 1 N. & McC., 517; 20 L. R. A., 730; 21 How., 356; 6 Pet., 60; 5 S. C., 467. *Contract without consideration:* 14 S. C., 337; 2 Strob., 203.

*Messrs. Edward McIver* and *W. P. Pollock,* contra; the former cites: *What is propor construction of this contract:* 12 Rich. Eq., 124; 15 S. C., 462; 44 S. C., 120; 23 S. E. R., 450; 49 S. C., 402; 50 S. C., 303; 22 S. E. R., 8; 18 S. E. R., 965. *Rule as to reversing finding of fact:* 41 S. C., 546; 16 S. C., 633. *Reception of fund by cashier is consideration:* 1 Smith's Leading Cases, *97.

March 1, 1898. The opinion of the Court was delivered by

JUDGE O. W. BUCHANAN, ACTING ASSOCIATE JUSTICE. On the 5th day of February, 1892, Mrs. R. J. Pollock subscribed for fifteen shares of stock in the Carolina Interstate Building and Loan Association. From the 5th day of February, 1892, to the 10th day of September, 1892, she paid the association in the way of admission fees and monthly instalments, of $10.50 each, the sum of $88.50. On an assignment of her shares she borrowed from the association on the 5th day of October, 1892, the sum of $1,500. As part of the same transaction, she mortgaged her house and lots. The condition of her bond was that she should pay to the association the monthly sum of $25.50 (the sum of $10.50 being the monthly instalments on said shares, the sum of $7.50 as interest on the sum borrowed, and the sum of $7.50 as premium,) on the 5th day of each month, until the said shares of stock shall have reached their par value of $100 each. This was followed by a proviso that if the said A. J. Pollock failed to pay said monthly instalments for ninety days from the time the same became due, then the whole sum borrowed, $1,500, should become due, with interest at the rate of six per centum per annum. On the 8th day of February, 1893, Mrs. R. J. Pollock conveyed the mortgaged premises, and assigned her stock to the plaintiffs,

who assumed her contract with the association. The mortgaged property was insured by the plaintiffs for $2,500—the loss, if any, payable to the association as its interest might appear. From the 5th day of October, 1892, to the 15th day of June, 1894, Mrs. Pollock and her assignees, the plaintiffs herein, paid to the association twenty-one monthly payments of $25.50 on the said debt, the sum of $535.50, making in the aggregate, with the $85.50 previously paid, the sum of $624. After the destruction of the house (part of the property mortgaged) by fire, which occurred on the 10th day of October, 1894, some question arose between the parties as to whom the insurance money should be paid, and the amount that should be paid to the association. The association, it seems, claimed that $1,293.43 was still due under the mortgage, and refused to release the policy of insurance until this sum was paid. The plaintiffs denied that so much was due. The plaintiffs could get no part of the insurance money until the policy was delivered up, and as the association would not give up the policy until the amount of $1,293.43 claimed by it was paid, the plaintiffs agreed to pay the whole amount of $1,293.43 claimed by the association to the defendant, the Bank of Cheraw, under an arrangement agreed to by the bank, that the whole amount claimed by the association was to be held by it until the amount due by the plaintiffs to the association could be adjusted and ascertained. The sum was paid over to the bank. On the same day the plaintiffs gave the bank written notice, forbidding it to pay more than $876 to the association; the bank, however, did pay over to the association the full amount claimed by it, it is charged, without plaintiffs' knowledge, and without waiting to ascertain what was due on the mortgage debt. Indemnity was taken by the bank from the association to protect itself in its action. This payment was made on the 14th day of January, 1895. The association had thus collected on its mortgage debt the sum of $1,917.43, not including interest on the payments made, although the contract rate of interest was six per cent. The

money was borrowed on the 5th October, 1892, and the last payment was made two years, three months and nine days thereafter. The plaintiffs began this action on the 29th day of July, 1895, to recover the excess paid the defendant association. Both of the defendants demurred to the complaint, among others, upon the ground that the plaintiffs not being parties to the original contract, could not plead usury. It was held by the Court that while this was true, nevertheless, the allegations were sufficient to maintain an action for money collected in excess of the contract, and also that the Bank of Cheraw was properly joined as a party to the suit. This ruling was sustained on appeal (48 S. C., 65).

The issues were referred by the order of his Honor, Judge W. C. Benet, to Mr. G. J. Redfearn to take the testimony and report. The cause came on to be heard before his Honor, Judge Klugh, at the June term (1897) of Court for Chesterfield County. The case was heard upon the pleadings, testimony taken before the referee, and exceptions taken to the same. In due time a decree was filed in favor of the plaintiffs' contention, from which an appeal to this Court was taken. The exceptions, several in number, relate really to (1) what is a proper construction of the contract between Mrs. R. J. Pollock and the association, and what was due under the contract on the 24th day of December, 1894; and (2) was the finding of fact by the Circuit Judge, that the Bank of Cheraw agreed to hold the money paid by the plaintiffs till it could be ascertained what was due, borne out by the facts; and if true, did such cashier have the authority so to bind the bank; and was the promise, if made, without consideration. These grounds presented on behalf of the defendants will now be considered.

What is the proper construction of the contract entered into by Mrs. Pollock with the Carolina Interstate Building and Loan Association? What was due under the contract on December 24, 1894? The assignees of Mrs. Pollock are the plaintiffs here, and their rights are to be measured by the rights of Mrs. Pollock under the contract.

They stand in her shoes, and must comply with her contract. If they are to receive anything, it is to be the same in amount that would have been received by her. What is the nature of the transaction? In this State, from the time of the decision of Bollinger's (*Association* v. *Bollinger*, 12 Rich. Eq., 124,) case (1860), our Courts have held that such a dealing as considered here was a loan—not a partnership transaction. Chancellor Carroll, who had heard the case on Circuit, was impressed with the view that it was a transaction between parties. Chief Justice O'Neil, writing the opinion in the Appeal Court, speaking for the Court, overruled this view, and laid down the rule still followed that the matter was to be treated as a loan. This rule was admitted as settled in *Association* v. *Dorsey*, 15 S. C., 462, and the late case of *Buist* v. *Bryan*, 44 S. C., 121. In the last case cited, Mr. Justice Gary, in a carefully considered opinion, speaks of the above authorities as having established the rule that "the money advanced was a loan;" that "the borrower is entitled to a credit not only for the amount paid as interest, but also for the amount paid for subscription on the shares of the stock, in ascertaining the amount due on the mortgage. * * * It will thus be seen that in determining the amount due under the mortgage, the association was required to deduct not only the amount of the dues paid *after* the execution of the mortgage, but also the amount of those paid *before* the execution of the mortgage." Again: "That upon the determination of his contract with the association as originally contemplated, the mortgagor is entitled to credits on his mortgage both for the amounts paid as interest and also as dues on his shares stock. That, where the amounts paid by the mortgagor, as interest and dues, aggregate a sum equal to the amount the mortgage was given to secure, a complaint for foreclosure of the mortgage will not be sustained." Continuing, he says: "The assignment and transfer of the shares of stock by the mortgagor as collateral security for the loan, and consolidating the interest and dues in the mortgage,

show that the amount paid monthly, consisting of interest and dues, is to be regarded as what is called 'redemption money,' and raises an implied agreement that such payment shall be credited on the mortgage." The syllabus to the case lays the rule down as follows: "All former payments of monthly dues and interest shall be credited on the mortgage debt, and if they are sufficient, at the contract rate of interest, to extinguish the debt, a complaint for foreclosure cannot be sustained; but if insufficient, the payments of dues and interest must be applied as credits on the bond." Now, in the light of this decision, what was the contract? what are the rights of the plaintiff here? and was the debt to the association overpaid? On the 5th day of February, 1892, Mrs. Pollock subscribed for fifteen shares of the stock of the association; up to the 5th day of October, 1892, she had paid $88.50, when she borrowed from the association the sum of $1,500. On the 8th day of February, 1893, the conveyance of the property and her assignment of her stock in the association was made to the plaintiffs. From the time she borrowed the money ($1,500) up to the 15th day of June, 1894, she and her assignees paid $535.50, aggregating in all $624. The plaintiffs then defaulted and paid no more. The obligation of the bond required Mrs. Pollock, and her assignees who took her place, to pay each month, after she borrowed, the sum of $25.50, the sum of $10.50 being the monthly instalments due on the shares of stock, the sum of $7.50 as interest on the sum borrowed, which a calculation will show was exactly six per cent. per annum on the sum borrowed, and the sum of $7.50 as premium.

The contract on its face is not usurious; it is within the amount allowed to be charged. It is to be observed that the rate is below what is ordinarily charged as interest for money borrowed in this State. The rate allowed by law is seven per cent., except where the contract upon that point is in writing, as high as eight per cent. is permitted by the act. Here the contract calls on its face for interest

at six per cent. merely. The difficulty arises here. The plaintiffs having paid the contract rate of interest (six per cent.), is credit to be allowed them for the payment of a sum equal to six per cent. (additional) on the amount borrowed as an alleged "premium?" Having paid the debt with the contract interest, shall the other monthly payments—$10.50 on the shares and the $7.50 as premium— be credited on the debt? This arrangement of charging only six per cent. on the face of the contract, yet requiring an additional payment each month equal to another six per cent., which is called "premium," doubtless was to avoid the usury laws and at the same time collect an excessive interest. Having stated in the bond that the contract rate was six per cent. as "interest" on the principal, are they not bound by it as "interest?" Ought they not to be compelled to credit any other payment over and above the said six per cent. on the principal of the debt? Should the association not be compelled to credit them with the other collections made each month? The charge of six per cent. on the face of the contract was to avoid the usury laws. They have charged six per cent., but, in addition, they require an additional monthly payment equal to another six per cent. charge, and call it premium. But having in their bond stated the "interest" to be only six per cent., they can't refuse to credit on the principal of their debt the other collections which they made the plaintiffs pay each month. The bond is not usurious, but the association attempted to enforce it usuriously. The sole question (and the whole question here) is, are the plaintiffs entitled to have credited on the bond what they have paid each month in addition to the contract rate of interest? Now, it so happens that the Supreme Court of North Carolina has construed a similar contract made by this very association (*Strauss* v. *Carolina Interstate Building and Loan Association*, 23 S. E. Rep., 450), in a suit brought to determine what was due on a bond of a borrowing stockholder, the provisions of which were exactly similar to the

one now before this Court. In that case, the question of usury was not involved, the association having failed, or gone into the hands of a receiver; but the contract was construed, the Court laying down the rule, that the borrowing member shall be charged with the amouut actually received by him, with six per cent. interest, and credited with the amounts paid by him as of the time of payment, "whether paid as dues, fines, premiums or in any other manner." This is the settlement of the North Carolina Courts. This is the settlement this very association has been ordered to make with its borrowing members in North Carolina.

Was this a contract to be performed in North Carolina? It seems that payments were to be made in Wilmington, N. C. Payments were to be made to a local treasurer in this State, if the member so desired. There were branch offices in this State. Payments might have been made within or without the State. This feature of payment to a local branch in this State, or to the general offices of the company in another State, is a familiar one in this class of cases. It cannot be told in advance always into what State a building and loan association may extend its business. The rates of interest vary with the different States. In some States it may be lower than in the State of its incorporation, in others it will be higher, so an arrangement is made that may be helpful to the association in obtaining the interest of the State allowing the greater interest. The arrangement of payment at the local office, with certain regulations, or that at the general office required in the first instance, may be used as "business principles" may require. The payment to be made with reference to the laws of the State of incorporation, or the use of similar language equally non-committal as to the place of payment or the place of contract. The language used adapted to that construction which the policy of the company in any particular case, moved by its interest, may direct. The actual determination of the question of whether the contract is to be considered a South Carolina contract or not (with this

election on the part of the borrowing member here), is so dependent on the establishment of the local branches, and their continuance and the regulative conditions so much in the power of the company, that oftentimes a contract that may be performed and dissolved within the State at the election of the borrowing member when he makes his debt, by matter arising subsequently, becomes payable beyond the State—and this without anything done on the part of the borrowing member. Add to this the various provisions (found so frequently in this class of cases) where payments are made to the local agents or members of a local branch, providing that such agents shall be considered the agent of the member paying merely and not the agent of the company, and we have a transaction hard to decide. The difficulty is not in the law—it is in the application of it to the facts, and the ascertaining of what are the facts in the case. It has long been the law that parties may contract for interest according to the law of the place of contract, or for interest at the rate of the place of performance of the contract, although in the latter case it may be at a higher rate than at the place of making the contract. In the latter case it is not opposed to the policy of either State—it is made in one State to be performed in another. Where the contract is made in the State, to be performed within the State, an agreement to take and receive interest, and to construe the contract in this respect by the laws of another State or country, which allowed a higher rate than allowed here, would not be enforced by our Courts. The law would not allow persons to contract against the very letter of the act, and then nullify the plain prohibition of the legislature. Within the rules laid down, persons may contract for payment of interest, and if they are of age and under no disability, the Court will enforce the contract. The cases of *Equitable B. & L. Association* v. *Vance*, 49 S. C. 402, and *The Same* v. *Hoffman*, 50 S. C., 303, held that such contracts for payment in another State are to be enforced according to the laws of the State where they are

to be performed and no more, following the accepted rule, and do not at all make against the general principle heretofore laid down, and whatever else appears in *Association* v. *Vance* was not necessary to the decision of the point in that case.  This would appear from the carefully guarded opinion in the Hoffman case.  This, I think, under the decisions, was a contract to be performed in North Carolina.  "A contract by which the stock taken out by a borrower, and assigned to the association, when the mortgage is executed, is forfeited to the association, on default, without allowance of credit on the mortgage for the payment made on the stock, is unconscionable, and though upheld by the laws of the association's own State, would not be enforced in North Carolina."  *Rowland* v. *Old Dominion B. & L. Association*, 22 S. E. Rep., 8.  See, also, same case, reported in 18 S. E. Rep., 965.  There was a provision in the bond that if Mrs. Pollock failed to pay the monthly instalments therein provided for, for ninety days from the time the same became due, then the whole of said borrowed sum, $1,500, should become due, with interest at the rate of six per cent. per annum.  This Court, in commenting on this provision on the former appeal, said: "Did this provision mean that the whole sum borrowed should be returned without giving credit for the payments made?  Would any Court enforce so unconscionable a contract?  The Courts of North Carolina (*Rowland* v. *Old Dominion B. & L. Association*, 22 S. E. Rep., 8 and 18 S. E. Rep., 965,) and of South Carolina (*Buist* v. *Bryan*, 44 S. C., 121,) have spoken in no uncertain terms, and have denied that upon such default the association may consider the whole amount forfeited in the face of the fact that payments have been made."  See, also, opinion of the Court of North Carolina in *Strauss* v. *Association*, *supra*.  In the absence of any evidence to show that the association has ever sold, disposed of or transferred the stock for any alleged default to itself, the consideration of the withdrawal value of current investment shares, and giving credit for the same upon the mortgage debt, becomes

unimportant in this case.   It may well be said in passing, however, that where credit is required to be given for actual payments made, no evasion, however phrased, will be allowed to defeat their application.   The North Carolina Court have said this very association shall be compelled in that State to give credit to borrowers in that State for all amounts collected, whether collected as dues, fines, premiums or in any other manner.   (2) The exceptions of the Bank of Cheraw practically question the conclusions of the Circuit Judge on the facts.   The wholesome rule that such findings of fact will not be disturbed, unless they are without testimony to support them, or manifestly against the weight of the testimony, was well settled in this State before the action of the last Constitutional Convention.   Whether any change in the rule was made, depends upon the construction of the provision inserted in the Constitution upon the subject.   The rule, therefore, has been laid down by the Court, in *Visanska* v. *Building and Loan Association*, 41 S. C., 546, where it is declared that "Before this Court will reverse the findings of fact by a Circuit Judge, even when based upon written testimony, we must be satisfied that the clear result of undisputed testimony points manifestly to a different conclusion from that reached by the Circuit Judge.   Where the testimony is conflicting, and the Circuit Judge has upon weighing it reached a conclusion which can be supported by the testimony, we will not interfere, although there may be other testimony in the case pointing to a different conclusion.   We are not to substitute our judgment for that of the Circuit Judge as to the comparative weight of the testimony," quoting *Gary* v. *Burnett*, 16 S. C., 633.   The Supreme Court not being a court of original jurisdiction—not being a court where actions or suits are begun in the first instance, must act, if at all, as an appellate court.   Only matters brought up before it by exceptions from the lower court could be entertained under the power given it by the Constitution and Statutes—without such exceptions, or grounds of appeal, brought up to

the Court as laid down by the Constitution and Statutes, it could not act. If action should be taken without such appeal or exceptions from the lower court, such action would be beyond the powers given that tribunal. So that it was not constituted for the purpose of discussing the merits of cases, nor weighing nice questions of the sufficiency or insufficiency of evidence. This Court could not enter into the trial *de novo* of the case. True, it was its duty to see there was no miscarriage of justice where the facts clearly made against the decision of the lower court. Some rule had to be laid down and the above one was adopted. There is some difference in the phraseology of the Constitution of 1895 from that of 1868. This difference grows out of the provision that the Supreme Court now "shall have appellate jurisdiction only in cases of chancery, and in such appeals they shall review the findings of fact as well as the law, except in chancery cases, where the facts are settled by a jury and the verdict not set aside, and shall constitute a court for the correction of errors at law under such regulations as the General Assembly may by law prescribe." Art. V., sec. 4. Still the Constitution of 1868, art. IV., sec. 4, provided that "the Supreme Court shall have appellate jurisdiction only in cases of chancery, and shall constitute a court for the correction of errors at law, under such regulations as the General Assembly may by law prescribe." In *Mortgage Company* v. *Faulkner*, 45 S. C., 508, the present Chief Justice, in discussing the change, says: "It seems to us that the real object of the change of phraseology in the present Constitution was to impose an obligation upon the Supreme Court to accept as final the facts found by a jury in a chancery case, unless their verdict had been set aside. It would require very different language from that found in the present Constitution to satisfy us that its framers intended that our books of report should be loaded down with elaborate discussions of questions of fact, which could not possibly afford precedents in future cases. When a question of fact has been determined by an intelligent, disinterested, and

experienced Circuit Judge, that certainly affords a reason for believing that his conclusion is correct; and it is incumbent upon the appellant to assume the burden of showing error therein; and unless he sustain that burden, the conclusions of the Circuit Judge should stand." In *Wagener & Co.* v. *Kirven*, 47 S. C., 347, Mr. Chief Justice McIver gives reasons in further vindication of the conclusion reached by the majority of the Court, citing the views expressed in *Mortgage Co.* v. *Faulkner*. We think the Circuit Judge had ample testimony to warrant his findings of fact, whether received from the stand-point of the law of South Carolina or North Carolina, there was more paid to the association than six per cent., the amount it agreed to receive, and it shall account for the payments it received in excess of the amount to be paid under its contract.

It is claimed that the agreement of the cashier to hold the funds paid into the bank was without consideration. This claim cannot be sustained. Long ago it was decided that "The confidence induced by undertaking any service for another is a sufficient legal consideration to create a duty in the performance of it." *Coggs* v. *Bernard*, Smith's Ldg. Cases, *97. The principle which governs the liability of a corporation for failing to perform a duty voluntarily assumed, is precisely the same as that which governs the liability of an individual in the like case. 5 Thomp. Comp., sec. 6357." In such cases as stated by Mr. Justice Grier in a leading case (*Philadelphia R. Co.* v. *Derby*, 14 How. U. S., 468, 485), the confidence induced by undertaking to perform such a service is sufficient consideration to create a duty in the performance of it." 5 Thomp. Corp., sec. 6357. The receiving of deposits by the cashier of a bank is so obviously for the purpose (among others) for which such institutions are operated, that only a passing notice need be taken of the objection that authority was wanting on the part of the cashier to receive the money paid to it. The bank received the benefit of it, of course. We think the Circuit Judge was right in finding that the money was re-

ceived by the bank under agreement to hold it, and that but for that agreement it never would have been paid to it; that it was a benefit to the bank, and that there was authority in the cashier to receive it for the bank. See 3 Myers Federal Decisions, 77–84. The judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES POPE, GARY and JONES concur in the result.