# CHARLESTON.

FLOYD *et al.v.* NATIONAL LOAN AND INVESTMENT COMPANY *et al.*

### Decided March 23, 1901.

1. **FOREIGN CORPORATION—***Comity.*
   So far as it conflicts with the provisions of section 30 of chapter 54 of the Code of 1899, the general law of comity, as affecting the rights of foreign corporations, has been repealed in this State.  (pp. 332, 333).

2. **CORPORATIONS—***Foreign and Domestic—Rights of.*
   By virtue of the second clause of said section, providing that "such corporation so complying shall have the same rights, powers and privileges, and be subject to the same regulations, restrictions and liabilities, that are conferred and imposed by this and the 52d and 53d chapters of this Code, and of chapter 20 of the Acts of 1885, on corporations chartered under the laws of this State," foreign corporations, upon complying with the conditions required by said section, have the same rights, powers, and privileges respecting their contracts and remedies, if not otherwise repugnant to the policy of the State, as domestic corporations of like character, whether, under the general law of comity, they would have had such rights, powers, and privileges or not, but they can exercise no greater powers in this State than its domestic corporations.  (pp. 335, 336, 337).

3. **CORPORATION—***Foreign—Regulation of.*
   A foreign corporation, coming into this State to transact business, must conform to the law of this State, if there be any, regulating similar corporations organized under the laws of this State; and its contract, although in terms solvable in the foreign state in which such corporation has its domicile, must be such a contract as a similar domestic corporation is authorized to make, or the courts of this State cannot enforce, or permit the enforcement of, its performance.  (p. 338).

4. **BUILDING AND LOAN ASSOCITAION—***Premium.*
   A domestic building and loan association may fix a minimum premium to be deducted in advance or paid in periodical installments, but in either case such premium must be a certain, definite sum, fixed and determined at the time of the making of the loan, and the contract of a foreign building association, made with a citizen of this State, secured by a deed of trust upon real estate situated in this State, and by its terms to be performed in the domiciliary state, must conform to this requirement; and, if it does not, such contract is not within the exemption from the operation of the usury laws given by our

statute to domestic building and loan associations, and in such case only the principal of the loan, with legal interest thereon, together with such sums as have been necessarily expended in preserving the property, less the amounts paid into the association by the borrower as dues, interest, premium, and fines, to be treated in the settlements as partial payments, can be collected, and a sale under the deed of trust will be enjoined until the amount thus due is settled, unless the basis of settlement herein laid down be conceded by the association in proceeding to sell. (p. 343).

Appeal from Circuit Court, Kanawha County.

Bill by Clara J. Floyd and John B. Floyd against the National Loan and Investment Company and B. H. Oxley. Decree for defendants, and plaintiffs appeal.

*Reversed.*

J. W. Kennedy, for appellants.

Brown, Jackson & Knight, for appellees.

Poffenbarger, Judge:

On the first day of September, 1894, the plaintiffs by their deed of trust conveyed to the defendant, B. H. Oxley, trustee, certain real estate situated in the city of Charleston, Kanawha County, in trust to secure to the National Loan and Investment Company of Detroit, Mich., the payment of two thousand five hundred dollars, according to the conditions of a certain bond bearing even date therewith, executed by the plaintiff to said company for the loan of said sum of two thousand five hundred dollars by it made to them, to secure the repayment of any and all sums said company might pay for taxes, insurance, and maintaining the property in repair, in case of the failure of the plaintiffs to make such necessary payments, and to secure the strict performance of all the obligations incumbent upon the said Clara J. Floyd as a shareholder in, and borrower from, said company under its charter, by-laws, rules and regulations then existing, or which might thereafter lawfully made, altered or amended.

It is recited in this deed that said Clara J. Floyd is the owner of twenty-five shares of stock in said company and has borrowed of it pursuant to its by-laws the money thereby secured, and by said deed she covenants and agrees to all things required of her to be done by the by-laws of said company as a shareholder and as a borrower and to pay to said company the sum of one dollar

and forty-five cents per share per month on her stock and loan, that being as stated, stock, interest and premium; also to pay all fines that should be legally assessed against her, such payments to be made until the stock owned by her should mature under said by-laws, and when it shall have matured or reached the value of one hundred dollars per share, said stock to be surrendered and cancelled and thereupon the deed to be void, and the property thereby granted to be released. Said deed provided that in case of default said trustee, upon the request of the company, should make sale of the property upon the following terms:

"(a) For cash in a sum sufficient to pay, first, the costs of executing this trust, the same to include a commission to said trustee of five per centum upon the gross amount of said sale; and second, the whole amount then due to said third party according to the terms of this deed, the bond herein mentioned and the by-laws and regulations of said company; (b) and the residue, if any there be, upon such terms as the said trustee or his successor may deem best."

And it was further expressly agreed therein that in case said trustee should sell said premises as provided in said deed by reason of the default of said parties of the first part in computing the amount due said party of the third part, said first parties should be considered and treated the same as a borrowing member of said company.

It was also covenanted and agreed in said deed that all payments herein mentioned should be made at the company's office in the city of Detroit, Michigan, that being the place where the contract therein set forth and the bond therein referred to were made; that the bond and instrument given to secure the payments mentioned in the bond shall in all cases be construed as under and in accordance with the laws of the state of Michigan, and the articles of incorporation and by-laws of said association, any provision whatsoever in the laws of any other state to the contrary notwithstanding, and that any provision in the laws of any other state at variance with the laws of the state of Michigan, either on the subject of interest, premium or any other matter is expressly waived, it being mutually intended by the parties thereto to make the contract in all things as a contract under and in accordance with the laws of the state of Michigan.

Under her obligations thus contracted, Mrs. Floyd made six-teen payments of which the first was in September, 1894, and the last in December, 1896, amounting in all to six hundred and eighteen dollars and twenty-two cents, of which one hun-dred and twenty dollars was dues on stock, two hundred and twenty dollars interest on the loan, two hundred and forty dol-lars premium, and thirty-eight dollars and twenty-two cents fines for failures to pay. She having ceased to make pay-ments, the trustee advertised the property for sale for cash in a sum sufficient to pay the costs of executing the trust, including five per cent. commission to the trustee upon the gross proceeds of the sale, and the whole amount due said company, three thou-sand and twenty-two dollars and twenty cents as of the 19th of July, 1897, and the residue to be paid in two equal install-ments of one and two years, and fixing August 21, 1897, as the day of sale.

On the 17th day of August, 1897, the plaintiffs filed their bill of complaint in the cause in the circuit court of Kanawha. County, setting forth substantially the foregoing facts, and alleging that said transaction was in substance and in fact a simple loan only, and was put in the form in which it was made under the requirement of the defendant company as a shift and device on its part to avoid the usury laws of this State; that the balance claimed to be due by the defendants on account of said loan is about six hundred dollars more than under the laws of this State it is entitled to on account of said loan, it being greatly in excess of the principal advanced with six per cent. per annum interest; that defendant company is entitled only to the balance due on account of said loan, computed upon the principal advanced with six per cent. interest, allowing as credits the monthly payments upon the principal of partial pay-ments; that by reason of the covenants and provisions of the deed of trust for breaches of which, authority could not be vested in the trustee to fix the damages, it could not be executed *in pais,* and though in form a conveyance to a trustee it is in fact and law nothing but a mortgage, and can be executed and enforced only by judicial decision in a court of equity; that the terms of sale specified in the trust deed and notice of sale are not such as the law requires in such case, and a sale there-under would be improper, erroneous and illegal, and greatly

to the prejudice of the plaintiff's rights; that said company has no authority under the laws of this State or the state of Michigan to make the loan in the manner and form in which it was made as thereinbefore alleged, the sole object for which said association was formed and the only legal authority vested in it being, to afford its members a safe and comfortable investment for their savings and aid them in the purchase and improvement of real estate and the building and improving of homesteads; that less than nine persons having formed said company, the number required by the laws of this State, it was without authority to make said loan; and that the amount claimed by said company, computed under its by-laws is greatly in excess of the amount that would be due, computed on the basis of six per cent interest and treating the payments as partial payments made on the debt in the usual way, and is therefore exorbitantly usurious. Copies of the deed of trust and by-laws of the company are filed with the bill as exhibits. The bill prays that the defendants be enjoined from making the sale and that the court take jurisdiction of the matters in controversy between the parties and make and enter such decrees and orders as justice and equity may require; and for general relief. The injunction was awarded as prayed for.

The defendant company appeared and demurred to the bill and answered it, admitting the loans and contracts of membership and security, and its attempt to enforce them, as alleged in the bill, averring their legality under the laws of Michigan, and of this State, that it has complied with the requirements of the statute relating to foreign corporations and that the contract is solvable in Michigan; denying that it is a shift or device to evade the usury laws of West Virginia, and also that the contract is illegal or usurious; that the amount due under it is uncertain, and there is necessity for resort to a court of equity for its enforcement.

To this answer there is no replication, and no depositions or affidavits were taken and filed.

On the 15th day of April, 1899, the circuit court dissolved the injunction and dismissed the bill, and an appeal from, and supersedeas to, this decree were allowed.

The allegation that this contract between the parties was not a contract of membership in said association on the part of

Mrs. Floyd, and a loan to her as such member in good faith, but on the contrary a mere shift and device to evade the usury laws of this State, is denied and there is no replication to the answer, which must be taken as true, but if there were a replication, there is no evidence to sustain the allegation. Upon the face of the papers nothing appears from which such an interpretation can be reached. The corporate existence of the association is admitted, and it is only insisted and objected that it has attempted to make a contract that it has no power or authority to make under the laws of this State or the laws of Michigan. As to the terms of sale, they are exactly as stipulated in the deed of trust, except as to any surplus that may remain after paying the costs of executing the trust, expenses of sale, including an agreed commission, and the amount due the company; and as to this surplus it is covenanted that it shall be upon such terms as the trustee might deem best. In the exercise of this discretion, which the parties were authorized to vest in him the trustee fixed the terms of sale, as to such surplus, in the notice. The agreement in the deed for a five per cent. commission to the trustee could not affect the validity of a loan or invalidate the notice. It does not go to the association nor enter into the loan, nor did it interfere with a prevention of the sale by payment of the debt. If illegal the trustee could not withhold it on a settlement of his accounts. The allegation of uncertainty in the amount due is denied, not replied to, and no proof offered. As to the character of the instrument, it is clearly not a mortgage, but the ordinary deed of trust to secure the performance of a building and loan contract and loan, such as are common in this State. There is a denial of the allegation of uncertainty as to the amount due, accompanied by an averment of a statement having been rendered to which no exceptions were taken, nor objections made. Besides that no facts are alleged from which uncertainty appears. In none of these matters does any ground appear upon which the bill or the injunction can be sustained.

There is but one real question in the case, and that is whether this contract made by a Michigan building and loan association with a citizen of this State to be performed in the other state and secured by deed of trust upon real estate situated in this State, can be enforced here. It involves the question of the

status in this State of a foreign building and loan association that has complied with the statutory conditions preliminary to its doing business here, and the nature of the contract it can make under such conditions; and this raises as a preliminary inquiry the question of the difference between the rights of individuals and corporations doing business beyond the limits of the state to which they belong.

Except by the law of comity no corporation, created in one state has the power to do business in another. Its very life in the franchise granted by its parent state, and creation of its law, which has no extra-territorial force. It is not entitled under the Constitution of the United States to the privileges and immunities of citizens.

"Now, a grant of corporate existence is a grant of special privileges to the corporators, enabling them to act for certain designated purposes as a single individual, and exempting them, (unless otherwise specially provided) from individual liability. The corporation being the mere creation of local law, can have no legal existence beyond the limits of the sovereignty where created. As said by this Court in *Bank of Augusta* v. *Earle*, 'It must dwell in the place of its creation, and cannot migrate to another sovereignty.' The recognition of its existence even by other states, and the enforcement of its contracts made therein depend purely upon the comity of those states — a comity which is never extended where the existence of the corporation or the exercise of its powers are prejudicial to their interests or repugnant to their policy." Mr. Justice Field in *Paul* v. *Virginia*, 8 Wall 180.

But this rule of comity exists and is enforced by the courts in every nation and every state of the Union, until destroyed by the law-making power. "In the silence of any positive rule affirming or denying or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government unless they are repugnant to its policy or prejudicial to its interest." Story Com. Law, 35.

"We think it well settled that by the law of comity among nations a corporation created by one sovereignty is permitted to make contracts in another, and sue in its courts; and that the same law of comity prevails among the several sovereignties of the Union." Chief Justice Taney in *Bank of Augusta* v. *Earle*, 13 Pet. 519.

In harmony with the general law of comity obtaining among the states composing the Union, the presumption should be indulged that the corporation of one state not forbidden by the laws of its being, may exercise within any other state the general powers conferred by its own charter, unless it is prohibited from so doing, either in the direct enactments of the latter state, or by its public policy, to be deduced from the general course of legislation, or from the settled adjudications of its highest court." Mr. Justice Harlan in *Christian Union* v. *Yount*, 101 U. S. 356.

Any state, however, may forbid and prevent a foreign corporation from carrying on its business within its limits, and also from doing certain acts or making certain contracts within its jurisdiction. "Whenever a state sufficiently indicates that contracts which derive their validity from its comity are repugnant to its policy, or are considered as injurious to its interests, the presumption in favor of its adoption can no longer be made." Chief Justice Taney in *Bank* v. *Earle, supra.* "Having no absolute right of recognition in other states, but depending for such recognition and the enforcement of its contracts upon their assent, it follows as a matter of course that such assent may be granted upon such terms and conditions as those states may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its business to particular localities; or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interests. The whole matter rests in their discretion." *Paul* v. *Virginia, supra.*

The only exceptions to this rule are in the cases of corporations engaged in foreign commerce, corporations engaged in interstate commerce, and corporations employed in the business of the government of the United States. "The only limitation upon the power of a state to exclude a foreign corporation from doing business within its limits, or hiring offices for that purpose, or to exact conditions for allowing the corporation to do business or hire offices there, arises where the corporation is in the employ of the Federal government, or where its business is strictly commerce, interstate or foreign . Corporations are not citizens within the meaning of the clause of the Constitution declaring that the citizens of each state, shall be entitled to all privileges and immunities of citizens in the several states.

Art. IV, sec. 2, clause 1. A private corporation is included under the designation of 'person' in the 14th Amendment to the Constitution, sec. 1. The provisions in the 14th Amendment to the Constitution, sec. 1, that 'no state shall deny to any person within its jurisdiction the equal protection of the laws' do not prohibit a state from requiring from the admission within its limits of a corporation of another state, such conditions as it chooses." *Pembina Co.* v. *Penna.*, 125 U. S. 181. In reaching these conclusions the court says: "The equal protection of the laws which these bodies may claim is only such as is accorded to similar associations within the jurisdiction of the State. The plaintiff in error is not a corporation within the jurisdiction of Pennsylvania. The office it hires is within such jurisdiction, and on condition that it pays the required license tax, it can claim the same protection in the use of the office that any other corporation having a similar office may claim. It would then have the equal protection of the law so far as it had anything within the jurisdiction of the State, and the constitutional amendment requires nothing more. The state is not prohibited from discriminating in the privileges it may grant to foreign corporations as a condition of their doing business or hiring offices within its limits, provided always such discrimination does not interfere with any transaction by such corporations of interstate or foreign commerce. It is not every corporation, lawful in the state of its creation, that other states may be willing to admit within their jurisdiction, or consent that it have offices in them; such, for example, as a corporation for lotteries. And even where the business of a foreign corporation is not unlawful in other states, the latter may wish to limit the number of such corporations or to subject their business to such control as would be in accordance with the policy governing domestic corporations of a similar character."

Under the law of comity which exists in every state, until repealed, and which the courts must, as well as may, enforce, a foreign corporation has no authority to do any act in a state other than that of its being, which is not permitted by the laws of such state to individuals generally. The law of comity merely enables a body of corporators chartered by one state to act in a corporate capacity in another state, subject to all the laws

and regulations of the matter.    Morawetz on Cor. s. 964; citing numerous cases.

From these authorities it is plain that any foreign corporation may do business in this State unless prohibited by law, or its business be such as is repugnant to our laws or the public policy of the State, "to be deduced from the general course of legislation or from the settled adjudications of its highest court;" and may do such acts in the state as are permitted by its laws to individuals generally, and no others. But such prohibition or repugnancy will not be implied from the mere silence of the state. "If the policy of a state or territory does not permit the business of the foreign corporation in its limits, or allow the corporation to acquire or hold real property, it must be expressed in some affirmative way; it cannot be inferred from the fact that its legislature has made no provision for the formation of similar corporations or allows corporations to be formed only by general law." *Cowell* v. *Spring Co.*, 100 U. S. 59.

The legislature of our State has not been silent on this subject. It has prescribed certain requirements to be complied with as conditions precedent to the right of all foreign corporations to do business in the State, and inserted therewith the following clause: "Any corporation duly incorporated by the laws of any state or territory of the United States, or of the District of Columbia, or of any foreign country, may unless it be otherwise expressly provided, hold property and transact business in this State, upon complying with the requirements of this section, and not otherwise." Section 30, chapter 54, Code. This is equivalent to saying that "no corporation duly incorporated by the laws of any state or territory of the United States, or the District of Columbia, or of any foreign country unless it be otherwise expressly provided, shall hold property and transact business in this State, without having first complied with the requirements of this section." In one sense it is a prohibition against foreign corporations and repeals the general law of comity, but it admits all foreign corporations except those expressly forbidden to the right to hold property and transact business in the State upon compliance with the requirements.

There is no statute expressly prohibiting foreign building and loan associations from doing business in the State. They are

not excluded, and such of them as comply with the statutory requirements are admitted.

The bill alleges that the appellee here has not complied with them. This allegation is denied in the answer accompanied with an averment that it has complied with them. To this there is no replication. The answer must therefore, be taken as true.

This Michigan corporation being thus authorized to do business in this State, its courts would not, in the absence of any further legislation restrain it from doing any act permitted by its laws to individuals generally, and could not refuse to compel, at its instance, the performance of any contract thus lawfully made with it; and if under such circumstances, it made a contract with a citizen of this State, to be performed in the state of Michigan, and such contract were authorized by its charter and the laws of the state of its being, it would be enforcible here although the rate of interest provided for and lawful in Michigan were higher than the legal rate here. But the legislature has given further expression to its will respecting foreign corporations, thus: "Such corporations so complying, shall have the same rights, powers and privileges, and be subject to the same regulations, restrictions and liabilities that are conferred and imposed by this and the 52d and 53d chapters of this Code, and by chapter 20 of the Acts of 1885, on corporations chartered under the laws of this State." Section 30, chapter 54, Code.

Can there be any doubt that the effect of this provision is to permit foreign corporations to have the same rights, powers and privileges that are conferred upon domestic corporations and no greater or different rights, powers and privileges? If that is not its meaning, what can be the legal effect of the clause, "Subject to the same regulations, restrictions and liabilities that are" imposed upon domestic corporations? Clearly it must operate as a prohibition upon the exercise by a foreign corporation of any greater or different rights, powers and privileges than are permitted to domestic corporations. Similar provisions occur in the statutes of several of the states, and in the constitutions of some of them; but many states have no such provision. It occurs in the Illinois statute in this form: "Foreign corporations and the officers and agents thereof, doing business in this state, shall be subject to all the liabilities, restrictions and duties that are

or may be imposed upon corporations of like character organized under the general laws of this state, and have no other or greater powers."

In *Stevens* v. *Pratt,* 101 Ill. 206, the court, in construing the provision held: "It is simply a law imposing regulations and restrictions, and its meaning is that where the general laws of this state provide for the organization of corporations, foreign ones of like character doing business in this state shall exercise no greater or different powers, and shall be subject to the same liabilities, restrictions and duties." Mr. Justice Schofield in delivering the opinion of the court, said: "The manifest and only purpose was to produce uniformity in the powers, liabilities, duties and restrictions of foreign and domestic corporations of like character, and bring them all under the influence of the same law." Our statute is equivalent to that of Illinois, and must have the same meaning. That being its effect, a foreign corporation can do no act, make no contract, and exercise no power in this State not permitted to like corporations organized under the laws of this State. The exercise by such corporation of any power not possessed by a similar domestic corporation would be repugnant to the public policy of the State as expressed in this statutory provision and for that reason, would be restrained by the courts of this State. We only recognize and give effect to the corporate existence of the foreign company, not to all the powers which, by its charter and the laws under which it exists, it has and may exercise in the domiciliary state. It will be permitted to exercise here only such of its powers as are not repugnant to our laws and policy. Such is the effect given the Illinois statute, by the courts of that state in determining the rights of foreign building and loan associations.

In *Granite State Providence Assn.* v. *Lloyd,* 145 Ill. 620, it is held: "Under s. 26, c. 32 R. S., where a foreign corporation of any kind comes into this state to transact business, it must conform to the law of this state, if it exists, regulating similar corporations organized under the general laws of this state. Foreign corporations doing business in this state are placed on an equality with domestic corporations to the extent that they shall exercise no greater or different powers and are made subject to the same regulations and restrictions and governed by the same rules of law in these respects. * * * A foreign corporation doing

a homestead and loan business in this state will be governed by the laws of this state as to the right of a stockholder to withdraw."

In *Rhodes* v. *Mo. Sav. & Loan Asso.*, 173 Ill. 621, it is held that: "In order that a foreign building and loan association may enforce in our courts a contract which would be usurious unless within the exemption given by our statute to local building and loan associations, it must appear that the statute under which such foreign association was organized is identical with or substantially like our own statute." In the first of these cases the Illinois courts compelled the foreign B. & L. Asso. to be governed by the statute of that state in respect to its settlement of the withdrawal value of its shares. In the other, the foreign associaion was denied the character, rights and powers of a B. & L. Asso because it appeared from its by-laws that it was not organized and doing business in the method prescirbed by the state laws for such associations. Its loan to the resident member was therefore treated as a simple ordinary loan in respect to its settlement, and it was only permitted to take the money advanced with legal interest after crediting the money paid into the association by the borrowing member.

In *Freie* v. *Fid. Union*, 166 Ill. 128, the court held: "A corporation created in another state may, upon the principle of comity, exercise within this state the. powers conferred by its charter, if not inconsistent with the law or against the public policy of this state. A foreign B. & L. Association doing business in this state may contract for premiums and fines in addition to legal interest on money loaned on stock when so authorized by the laws of the state of its creation, without violating the usuary statutes of this state."

In the opinion in this last case it is said: "By the statute of Indiana under which complainant was organized, it had power to enter into the contract in this case, and it was not contrary to the laws or policy of this state which permit the organization of like corporations with the same powers."

Relying principally upon these cases, the law is laid down as follows in s. 8797, vol. 7, Thompson Com. on Law of Corp.:

"Where a building association undertakes to do business in a state other than that of its creation, whilst a contract made by it in the former state, sanctioned by the statute under which the society was organized, will not be deemed unlawful in the state

in which it was made and is sought to be enforced, when it would not be so if made by an association of that state, yet such an association acts and does business in such state (even when duly licensed) subject to its laws and regulations as applied to its own domestic associations by virtue of its statutes and decisions, and will not be permitted to have or exercise any greater or different powers than, but to be held to the same liabilities, restrictions and duties as, domestic ones. Under this view, moreover, it is deemed legitimate to test the character of a foreign corporation assuming to act as a building association, by reference to the laws of the state in which it so assumes to act, and to deny it that character, if, by such comparison, its nature and powers are found to be different from and in excess of, what the laws and policy of that state recognize as belonging to such associations; with the result that contracts, permitted to such associations but unlawful to others, will not be accepted as valid when set up by foreign associations, not properly classible as building associations according to that criterion."

The same principle has been applied by other courts in other cases. In *Cravens* v. *N. Y. L. Ins. Co.,* 50 S. W. Rep. 519, it was held that although a foreign corporation doing business in the domestic state may by contract, when no domestic statute prohibiting it intervenes, make the law of the state of its incorporation the applicatory law of the contract, yet where the laws of the domestic state prohibit foreign corporations from making certain kinds of contracts they can act only in accordance therewith. 13 Am. & Eng. Enc. Law (2d Ed.) 841, note.

In *Canada Sou. R. R. Co.* v. *Gebhard,* 109 U. S. 527, it was said: "A corporation of one country may be excluded from business in another but if admitted it must *in the absence of legislation equivalent to making it a corporation of the latter country,* be taken both by the government and those who deal with it as a creature of the law of its own country and subject to all the legislative control and direction that may be properly exercised over it at the place of its creation." In that case the question was the validity of a release of a Canadian corporation from part of its bonded indebtedness by a proceeding in the nature of bankruptcy under legislation of the Canadian parliament there being no limitation there upon the right to impair the obligation of contracts.

On the subject of the incorporation of B. & L. Associations,

their methods of business and their rights, powers and privileges, this State is not without legislation, and it is insisted that in seeking the enforcement of its contract with the appellants, the appellee is -claiming a right and power not permitted to domestic associations, because it has departed from the requirements of the statute in the nature of the contract it has made. This alleged departure refers to the premium bid for the right of precedence in taking the loan. Section 26, chapter 54, Code, provides that, "Every such association shall have the power to provide by its by-laws for selling to the stockholders who shall bid the highest premium therefor, the money in the treasury, or in default of bidders at or above a minimum premium may award to a member the value of any shares held by him less such minimum premium; the minimum premium and the mode of making the award to be fixed by the by-laws. Or such association may charge and receive the premium bid by a stockholder for the priority of right to such loans, in periodical installments; but the by-laws of every association shall set forth whether the premium bid for the prior right to such loan shall be deducted therefrom in advance, or be paid in periodical installments."

The by-laws of the appellee under which the contract in the case at bar was made provide that, "The amount of premium bid shall be taken out of the amount borrowed, but it is expressly provided that, after the 15th of September, A. D. 1891, borrowers competing for loans from this company shall bid as a premium a stated amount per share, payable monthly on the last Saturday of each month. Said stated amount per share per month to be paid each month during the existence of the shares of stock borrowed upon."

There is a difference between a premium, the amount of which is ascertained and fixed at the time the loan is made, and then divided into installments and paid periodically, and a premium of a certain sum to be paid on each share each month for an indefinite and uncertain length of time. The former arrangement is plainly contemplated and required by our statute; the latter is provided for in the appellee's by-laws, and embodied in its contract with said appellant. When this monthly payment of premium will end depends upon the date of the maturity of stock, and is, therefore, uncertain. The difference between them is that the amount of premium under a contract authorized by the law is certain in amount, while in the contract here it is

uncertain in amount making a difference in liability on the borrower's part and involving the exercise of a different power on the part of the association from what are permitted in such cases by the law of this State to domestic associations.

The stock of the association upon which this advance was made is its installment stock of class "B," and the payments on it are "to continue each month until such shares shall have reached the par value of one hundred dollars each as shown by the report of the auditing committee" and as long as the shares run, the premium must be paid. The time to run being uncertain, the amount of premium to be paid is uncertain also.

The difference between the results under the two systems is said to be slight. In Thomp. Com. Cor. s. 8779, it is said, "The essential nature and purpose of the premium are the same in both of these systems, and their practical operation substantially alike. In neither case is the premium paid; the borrower simply promises to pay it. * * * * Except where the premium consists simply in an increased rate of interest, it is not contemplated that it shall be paid dollar for dollar, by the borrower, in strict conformity with the letter of his undertaking. All he is bound to do is to pay the periodical amounts coming due upon his obligation, and to continue doing so until the shares of the society or series to which he belongs have reached maturity; then his debt and premium bid are both discharged by relinquishing to the association his credit in the same. Unless the society is unfortunate, this period will be reached a considerable time before the borrower's payments with interest, shall amount to the aggregate of what he received, with interest, together with what he promised to pay by way of premium. The period for ascertaining the amount of the premium actually paid by the borrower is the date of the mautrity of the shares and distribution of assets."

However the books say, and courts have held, that where an association is authorized by statute to operate upon one of these systems respecting the premium, it cannot adopt the other without making the contract unlawful to the extent of the excess of the reservation above the legal rate of interest. Endlich on B. A. ss. 407-8; *M. W. M. S. B. A. of New Haven* v. *Wilcox,* 24 Conn. 147; *Same* v. *Meriden Agency Co., Id.* 159; *Birmingham* v. *M. L. & T. H. A.,* 45 Md. 541; *Geiger* v. *Eighth German B. A.,* 58 Md. 569; *White* v. *Williams, assignee,* Md.; *Gray* v. *Balto. B. & L. A.,* 48 W. Va. 164.

The care which the legislature has taken to state explicitly the plan upon which such associations may operate, and the means it has adopted to compel adherence to it, indicate that the law making power of the State deems it important. The law relating to the subject of building associations is contained in four sections of the chapter, followed by these words: "Every such association shall adopt by-laws, which shall embrace all the provisions of the four preceding sections, and such further provisions for its government, and the management of its business not inconsistent with these sections as it may deem proper."

No departure from the method of doing business thus prescribed is allowed. There can be no question as to the legislative intent to compel absolute adherence and obedience to its plan for conducting the operation of these societies. Further evidence of this is found in the radical change effected in the law by chapter 58, Acts of 1883, by which the present law came into existence. Prior thereto the provision relating to premiums was, "Every such association is authorized to levy, assess and collect from its members such sums of money, by stated dues, fines, interest on loans advanced, and premiums bid by members for the right of precedence in taking loans as the corporation by its laws shall provide." And this change came immediately after the decisions of this Court in *Pfeister* v. *Wheeling B. & L. A.,* 19 W. Va. 676; *McGannon* v. *Central B. & L. A., Id.* 726; *Parker* v. *U. S. B. L. & L. A., Id.* 744; *Parker et al.* v. *Same, Id.* 769; and *Haigh* v. *Same, Id.* 793; by which the building association statutes of the State were construed and applied to the transactions of said societies.

Measured by the standard of our statute this association is found by the method of its operations and the nature of its contracts not to have the character of a building association and cannot therefore be permitted to enforce its contract as a building association contract. It is contravened as such by the policy of the State, and is therefore not within the law exempting such associations from the usury laws, unless there is some other principle or ground upon which it may be permitted to collect the money for which it has contracted.

Counsel for the appellee insist this contract is made and to be performed in the state of Michigan and is valid by the laws of that state, and that therefore the *lex loci contractus* controls it. This position would be unassailable if the appellee were a natu-

ral person insisting upon the right to enforce a contract solvable in the state of Michigan, and carrying the legal rate of interest of that state. But it is not. It is a building association, a corporation, clothed with special privileges, among which is exemption from the usury laws of its own state. The general law of comity under which, it is contended, it might have carried such special powers and privileges into, and exercised them in this State, in the absence of any public policy on the part of this State to which their exercise here would have been repugnant, has been expressly repealed. But the law of comity only permits corporations to do in a foreign state such acts as individuals are permitted to do, and it may well be doubted whether a corporation exempted from the usury laws of its own state could carry that exemption into and assert it in the courts of another state, a thing that is permitted to no individual in any country, and may be deemed therefore, to be against public policy everywhere.

The cases of *Klinck* v. *Price,* 4 W. Va. 4; *Pugh* v. *Cameron's Admr.,* 11 W. Va. 523; *Wilson* v. *Lazier,* 11 Grat. 447; *Findlay* v. *Hall & Concord,* 12 O. 610; *Shipman* v. *Bailey,* 20 W. Va. 140; *Tolman* v. *Read,* 115 Mich. 171; *Sawyer* v. *Dickson,* — Ark. 71; *De Walk* v. *Johnson,* 10 Wheat. 383; cited by counsel for appellee, are all cases of contracts payable to natural persons, solvable in foreign states and conformable to the general laws of those states respecting the matter of interest. In none of them was a special rate of interest permitted by the foreign state, only to a certain class of corporations, whose existence need not be recognized beyond its own territorial limits, recognized or enforced.

Two cases are cited, however, in which the position taken here by the appellee is upheld: *B. & L. Assn.* v. *Logan,* U. S. Circuit Court of Appeals; and *Bennett* v. *B. & L. Assn.,* 177 Pa. St. 233; but in neither of these cases was the fact that the building association was setting up and claiming under the law of comity, an exemption from the general law of their own respective states, and not the laws themselves—special privileges permitted to them by their states, but denied to natural persons. Other cases of the same class might have been cited; *National Mu. B. & L. Asso.* v. *Ashworth,* 91 Va. 706; *Ware* v. *Bankers, &c.,* Co. (Va.), 29 S. E. 744; *Balto. B. & L. Asso.* v. *Titlow,* 19 Pa. C. C. 518; *Eq. B. & L. Asso.* v. *Hoffman,* 50 S. C. 303; *Turner* v.

*Interstate &c. Assn.* 27 S. E. 947; and *Pollock* v. *Carolina &c. Asso.,* 29 S. E. 77.

In support of the position taken here Morawetz on Corp. s. 964 is re-cited. The law there is stated thus: "A corporation has no implied authority to do any act in a foreign state which is not permitted by the laws of the latter to individuals generally. The law of comity merely enables a body of corporators chartered by one state to act in a corporate capacity in another state, subject to all the laws and regulations. of the latter." Again, s. 967, same work, it is said: "It is the charter alone which is recognized by the law of comity and not the general legislation of the state in which the corporation is formed. The word 'charter' is here used to signify the agreement between the shareholders of the corporation, whether this agreement be contained in a special act of the legislature, or in articles of association, or in either of these taken in connection with certain general laws of the state."

In *Bard* v. *Poole,* 12 N. Y. 486-505, we find this: "It is of course implied that the contract must be one which the foreign corporation is permitted by its charter to make; and it must also be one which would be valid if made at the same place by a natural person, not a resident of the state." See also *McGregor* v. *Erie Ry. Co.,* 35 N. J. Law 115; *Bank* &c. v. *Earle,* 13 Peters 539; *Stetson* v. *City Bank,* 2 Ohio St. 174; *Lewis* v. *Bank of Ky.,* 12 Ohio 132.

Would the courts of any state permit an individual of another state to enforce a contract in violation of the usury laws of his own state? Comity recognizes only the general laws of the foreign state, not the local exemptions from, or exceptions to, such laws.

But there is another reason why these authorities cannot be accepted here. It does not appear in any of these cases, that, in the states in which they were decided, the legislatures have placed foreign corporations under the same regulations, restrictions and liabilities, and conferred upon them only the same rights, powers and privileges, that are imposed and conferred upon corporations existing under their own laws. There are, either no declarations in those states of public policy forbidding the exercise there by foreign corporations of powers greater than, or different from, the powers permitted to their corporations,

as in this State and in Illinois, or the courts have failed to pass upon the very important question whether they shall be applied or not applied. Nor does it appear from these cases that, in all instances the building and loan contract involved was in conflict with the domestic law, governing such contracts. A contract by such an association of another state, not in conflict with our building association statute, would be enforced here, not by virtue of the general law of comity, but because our law makes the status of such a foreign association the same as that of our own associations and gives it the same rights, powers and privileges, and remedies, in respect to its contracts, although for many purposes it remains a foreign corporation.

If the powers they assume to exercise are the same as, or within and not beyond, those permitted to our own associations, they are enforcible; otherwise they are not.

Another contention against the position taken in this opinion is that the premium reserved in this contract is certain in a legal sense—that under the Michigan law, the stock has a fixed maximum limit for its maturity, viz: such period as will permit the stock dues to equal the face of the shares, but liable to be shortened by application of dividends; and therefore, upon the principle that that is certain which can be made certain, our statute is not violated. In other words, if the monthly dues are fifty cents per share, and the shares one hundred dollars, the stock must mature in sixteen and two-thirds years, without any accumulation of profits, and the period required for maturity will be less than that, according to the amount of the earnings over expenses and losses.

Our statute requires no precedent certainly as to the stock dues, and in that respect it is like the Michigan statute. But as to the premium it must be so fixed in advance that the borrower can know exactly how many dollars he is to pay on account of premium, how much of his money is to go into profits or losses of the company, and not become a direct credit upon his loan. He is entitled to credit upon his loan for every dollar he pays in as dues. He will receive credit on his loan for but an infinitesimal part of what he pays in as premium and if the concern's losses equal its profits he receives none of it. That there is no such certainty in this contract is indisputable. That our statute requires such certainty is undeniable whether in its operation it produces it in all cases or not.

While this contract cannot be enforced according to its terms it is not so unenforcible because of its want of equity between the borrower and investor which is perhaps no greater than might occur in an association conforming to our statute, as we set no limit upon the ratio between dues and premium from which this inequitable result flows; nor because, under the contract, the amount now due from the appellant is far beyond the amount she borrowed, an inevitable result in every building association contract in which default continues for a long time; nor because of any improper motive on the appellant's part, or of the agents of the association in entering into it, for there is not a scintilla of evidence of that in the nature of the contract or elsewhere in the record; but simply because it is such a contract as is clearly repugnant to the public policy of the State, plainly written in its legislation, and, therefore, prohibited as to all building associations.

But the appellant has received two thousand five hundred dollars from this association and secured the performance of her said contract by a deed of trust upon her real estate, and she comes into court to have the lien released, offering to pay the principal of the debt with legal interest thereon, subject to credit for the money she has already paid in. This, together with any sums paid out by the appellee upon taxes, insurance, or other expenses necessary to preserve the property, constitute a lien upon the property and must be satisfied as in seeking equity the appellant must do equity.

For the reasons herein stated the decree must be reversed and the cause remanded for further proceedings according to the principle herein laid down, and further according to the rules and principles governing courts of equity.

*Reversed.*